ANDERSON McDOWELL *v.* STATE OF MARYLAND

[No. 606, September Term, 1975.]

*Decided June 8, 1976.*

The cause was argued before MORTON, POWERS and MASON, JJ.

*Paul G. Evans, Assigned Public Defender*, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Steven Tully, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant was convicted by a jury in the Criminal Court of Baltimore (Cole, J., presiding) of murder in the first degree and unlawful use of a handgun under one indictment; robbery with a deadly weapon under a second indictment; and assault and battery under a third indictment. He was sentenced to life imprisonment on the murder conviction; twenty years (concurrent) on the armed robbery conviction; five years (concurrent) on the handgun conviction; and five years (consecutive) on the assault and battery conviction.

William Schmuck testified that about 3:30 p.m. on November 28, 1973, while helping his brother, LeRoy, who operated a shoe repair shop in Baltimore City, two men came into the shop. He described one of them as short with a ladies' silk stocking over his head and face and the other as tall. Both had drawn guns. He stated that the tall one took all the money out of the cash register and placed it in a paper bag. He then turned to Schmuck's brother and asked: " 'Where's the rest of it?' My brother pointed to the little cabinet underneath the cash register, and said, 'The rest of it is down there.' As soon as he got the last words out of his mouth, they both opened up at once, and shot him down. I was right in back of him three or four feet. The bullets missed me by six inches, and went right past me, right through the wall." He estimated that four or five shots were fired. He stated that as the assailants were running out the door, the tall one dropped the bag containing the money. According to Schmuck, an eleven-year old boy, Philip Randolph, who lived a few doors away, witnessed the entire hold up and ran to notify a nearby police officer as the assailants made their escape.

During cross-examination of Schmuck by appellant's trial counsel, the following occurred:

> "Q. And a moment ago you said that the defendant sitting there looks like the tall person. You can't beyond a reasonable doubt say that this is the man that was in your store, can you, sir?
>
> A. Not positive, but it looks a lot like him. Of course, I was upset, you know."

A police officer testified that on December 2, 1973, he visited the home of Philip Randolph and in the presence of his mother handed the boy a group of five photographs. Randolph selected a photograph of the appellant and identified him as the tall assailant.

Philip Randolph took the stand and stated that he was in the shoe repair shop at the time of the murder and robbery which, in his words, were committed by one short individual and one tall individual. According to Randolph, he was shown a group of photographs several days after the crimes and picked out a picture of the appellant as the tall assailant. He could not make an in-court identification of the appellant and on cross-examination said he may have been mistaken in picking out the appellant's picture as one of the assailants.

Kevin Faison, an accomplice who pleaded guilty to manslaughter, testified that he and the appellant, together with a boy named Pernell Gross, went to the repair shop in the afternoon of November 28, 1973; that he stayed outside to "look for the police"; that appellant and Gross entered the shop and shortly thereafter he heard a shot. He testified that immediately thereafter "the little boy came running out of the store" shouting "Mr. Roy just got shot." When asked what happened to appellant and Gross, he answered: "I guess they ran." He further testified that about two days later he encountered appellant who told him "that the police was looking for him, and he was going down Westside." He further testified that appellant said that the police were looking for him "About a man * * * In the shoe shop."

Appellant also told him that "he went to the hospital * * * For he got shot in his arm."

Alan Jackson testified that on November 30, 1973, he had a conversation with appellant, Pernell Gross and another boy during which the appellant "was telling me about the shoe shop got robbed" and how "him and Pernell had went in there * * * He told me that he was holding the money bag in his hand * * * And he dropped the money bag. * * * Because he said he got shot. * * * By Pernell." According to Jackson, Pernell Gross told him during the same conversation and in the presence of appellant that he, Gross, had "said he had to shoot the man, and he said that he made the mistake and shot Cool [appellant] in the arm."

Appellant took the stand, denied any participation in the crime, but admitted having been previously convicted of assault with a deadly weapon. He further testified that Faison and Gross had invited him to participate in the robbery of the shoe repair shop but that he refused. Immediately subsequent to the robbery he had seen Gross and Faison. Gross, after accusing appellant of planning to "snitch" on them, shot him in the arm. He was later treated at University Hospital.

John Wilson, a defense witness, testified that between 3:30 p.m. and 4 p.m. on November 28, 1973, he and the appellant were playing basketball in Lyndhurst Park when Pernell Gross approached appellant, shot him and then chased him from the park.

It is in this factual posture that appellant contends that there was a failure of proof to sustain the indictment for first degree murder with malice, premeditation and deliberation. The appellant argues that the indictment charges that he "feloniously, wilfully and of deliberately premeditated malice aforethought did kill and murder one Roy Schmuck, contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State." Appellant asserts that "The statute to which the indictment refers appears to be Article 27, § 407," whereas, he was convicted of a violation of Maryland Code, Art. 27, § 410.

Maryland Code, Art. 27, § 407 provides:

"All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree."

Maryland Code, Art. 27, § 410 provides:

"All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape, sodomy, mayhem, robbery, burglary, kidnapping * * * shall be murder in the first degree."

There are two short answers to appellant's rather novel but completely unsubstantiated contention. First, nowhere in the indictment is either statute mentioned. Thus, it is pure speculation to say that the statute referred to in the indictment is § 407. Secondly, and more importantly, murder is a common law crime not a statutory crime. Sections 407 and 410 "do not create any new crime, but merely classify murder, as it was known at common law, into degrees. [Citations omitted.] At common law, a killing in the perpetration of a robbery was murder, regardless of intent. See Clark and Marshall, *Crimes* (4th ed.), sec. 245. As used in the statute, the 'common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed.' *Davis v. State, supra* [39 Md. 355]. It is perfectly clear that a finding either that the killing was wilful, deliberate and premeditated, or that it was in perpetration of a robbery, would support a verdict of first degree murder." *Stansbury v. State,* 218 Md. 255, 260 (1958).

Here, the evidence adduced would permit either finding. Certainly, the murder was committed in the perpetration of a robbery. In *Mumford v. State,* 19 Md. App. 640, 643 (1974), this Court stated: " * * * the fact that the accused was committing a felony creates proof of malice and pre-meditation sufficient to sustain conviction for first degree murder for any killing consequent to the felony." *See White v. State,* 23 Md. App. 151 (1974).

On the other hand, the senseless shooting of the victim four or five times after he had told his assailants where the rest of the money could be found creates a rational inference that the killing was wilful, deliberate and premeditated. In any event, the evidence conformed with the charge set forth in the indictment. We think that the contention is wholly without merit.

It is next contended that the trial judge committed reversible error in permitting the state to elicit from the witness, Alan Jackson, that during his conversation with the appellant and Pernell Gross shortly after the murder and robbery, Gross had said he was trying to shoot the victim and mistakenly shot the appellant in the arm. The trial court, in apparent reliance on the holding in *Ewell v. State*, 228 Md. 615 (1962), admitted the testimony over appellant's objection. In *Ewell*, the Court of Appeals stated, at 618:

> "It is generally held that if a statement is made by another person in the presence of a party to the action, be it civil or criminal, containing assertions of facts which if untrue the party would under all the circumstances naturally be expected to deny, his failure to speak is circumstantial evidence that he believes the statements to be true, and his conduct is thus receivable against him as an admission of such belief."

Former Chief Judge Hall Hammond, who wrote for the Court in *Ewell*, went on to say, at 619:

> "Because of the hearsay rule, failure to deny an incriminating statement is not admissible as direct evidence of the fact asserted, but it may be received as showing the reaction of the accused to the statement and from his reaction an inference of guilt may be drawn. The trial judge must determine, as a preliminary matter, whether the statement and the failure to rebut it occurred in an environment and in the presence of actors such that a reply might naturally have been expected. If he

decides the testimony is admissible, then it is for the jury, under proper instructions from the court (that such evidence is to be received with caution, that it is not substantive evidence of the fact asserted and does not of itself show guilt and that it is but a circumstance which permits the drawing of an inference of guilt) to determine: (a) whether the accused was aware of the making of the statements; (b) whether under the circumstances a reply was to be naturally expected; and (c) whether the failure of the accused to reply showed an awareness, a consciousness of guilt."

Here, it was established that appellant was present when Gross made the statement to the witness, Jackson, and there was no denial interposed by appellant. While it is clear that the trial judge made his preliminary determination to admit the challenged testimony out of the presence of the jury, he did not comply with the admonitions laid down in *Ewell* that cautionary instructions be given to the jury concerning the nature of such testimony and the treatment it should be accorded. No exception to the omission was taken by appellant. In *Ewell*, where likewise no exception had been taken to the omitted instructions, the Court of Appeals refused to consider the omission. *See Ewell, supra*, at 621. We follow that same policy in this appeal. Maryland Rule 756 g.

In contesting the admission of Jackson's testimony, the appellant advances the further argument that its admission constituted a denial of his right under the sixth amendment to the United States Constitution and his right under Article 21 of the Maryland Declaration of Rights "to be confronted with the witnesses against him." [1] Appellant recognizes that the decision of the United States Supreme Court in *Dutton v. Evans*, 400 U. S. 74 (1970), constitutes an impediment to his argument, but he endeavors to avoid its impact by

---

1. Unexplainably, the state in its brief makes no attempt to meet the issue.

asserting that *Dutton v. Evans* is distinguishable from the case at bar. In *Dutton v. Evans*, Evans had been convicted in a Georgia court of participating in the murder of three policemen. In the course of the trial, a witness for the state, named Shaw, was permitted to testify that Williams, an accomplice of Evans, had told him [Shaw] while he was in prison awaiting trial that if it had not been for Evans, he, the accomplice Williams, would not "be in this now." Objection to the testimony was made on the ground that the introduction of this hearsay testimony was in violation of Evans' right of confrontation. The objection was overruled and the issue before the Supreme Court was whether Evans' murder conviction should be set aside because of the admission of this testimony.

In the course of holding that the admission of the testimony did not constitute reversible error, Mr. Justice Stewart, in speaking for the Court, stated at 80, 86:

> "It is not argued, nor could it be, that the constitutional right to confrontation requires that no hearsay evidence can ever be introduced."

* * *

> "It seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots. * * * But this Court has never equated the two, * * * and we decline to do so now."

He went on to point out that in *Pointer v. Texas*, 380 U. S. 400 (1965), the Court had recognized the admissibility against an accused of dying declarations and also testimony of a deceased witness who had testified at a prior trial. And, of course, there are others, *e.g.*, business records, excited utterances, and testimony given at a prior trial where the witness is otherwise available for the current trial.

Mr. Justice Stewart continued, at 88:

> "From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination,

and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard."

He further stated, at 89, that:

" * * * the circumstances under which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a showing that Williams had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant."

The factual posture of *Dutton v. Evans, supra,* is substantially identical to that presented in the record before us. The appellant's trial counsel had the opportunity to cross-examine Jackson, a witness under oath, and counsel did so vigorously. The jury had the opportunity to observe Jackson's demeanor, to assess his reliability and to determine the truthfulness of his testimony concerning Gross's statement that he had inadvertently shot the appellant in the course of the robbery. Moreover, the circumstances under which Gross made the statement were such as to give reason to believe that he did not misrepresent appellant's involvement in the crimes. His statement to Jackson in the presence of the appellant was spontaneous and against his own penal interest. "These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant." *Dutton v. Evans, supra,* at 89.

Mr. Justice Harlan in his concurring opinion in *Dutton v. Evans, supra,* made this observation which we find to be persuasive, at 96-97:

"Regardless of the interpretation one puts on the

words of the Confrontation Clause, the clause is simply not well designed for taking into account the numerous factors that must be weighed in passing on the appropriateness of rules of evidence. The failure of Mr. Justice Stewart's opinion to explain the standard by which it tests Shaw's statement, or how this standard can be squared with the seemingly absolute command of the clause, bears witness to the fact that the clause is being set a task for which it is not suited. The task is far more appropriately performed under the aegis of the Fifth and Fourteenth Amendments' commands that federal and state trials, respectively, must be conducted in accordance with due process of law. It is by this standard that I would test federal and state rules of evidence.[4] "

By way of the footnote, he elaborated further:

" [4] Reliance on the Due Process Clauses would also have the virtue of subjecting rules of evidence to constitutional scrutiny in civil and criminal trials alike. It is exceedingly rare for the common law to make admissibility of evidence turn on whether the proceeding is civil or criminal in nature. See 1 Wigmore, *supra* [Wigmore, *Evidence*, 3rd ed. 1940], § 4, at 16-17. This feature of our jurisprudence is a further indication that the Confrontation Clause, which applies only to criminal prosecutions, was never intended as a constitutional standard for testing rules of evidence."

By whatever route pursued, we think that in the factual circumstances here, the trial judge did not commit reversible error in admitting Jackson's testimony that while he was conversing with Gross and appellant shortly after the murder and robbery, Gross said he mistakenly shot appellant while attempting to shoot the victim. There may be occasions where the facts would demonstrate a violation

of an accused's constitutional right to confrontation or due process of law, but on the record before us this is not such an occasion.

Appellant next complains that he was misled by the answers given by the state to interrogatories he propounded before trial. It appears that the state advised him: "The Defendant made no statements or confessions, oral or written, which are known to the State at the present time." Appellant contends that he should have been advised in the state's answer of the incriminating statements he made to Jackson and of his admission, by silence, of the truth of Gross's statement to Jackson. The short answer to this contention is that we have consistently held that the state is not obliged to furnish a defendant with the substance of statements given to non-state agents since such statements do not come within the purview of Maryland Rule 728. *See Funderburk v. State*, 12 Md. App. 481 (1971); *Smith v. State*, 4 Md. App. 146 (1968); *Barton v. State*, 2 Md. App. 52 (1967). Obviously, Jackson was not an agent of the state.

It is next contended that the trial judge erroneously failed "to suppress in-court identification." Appellant argues that the photographic display to young Philip Randolph was impermissibly suggestive. He asserts that appellant was the only individual in the five photographs shown to Randolph who was wearing "plaits." Randolph was never asked whether appellant's hair style had anything to do with the selection of appellant's photograph and since Randolph had advised the police that one assailant was wearing a stocking over his face and the other had a stocking on his head, it seems highly unlikely that the plaited hair had any unfairly compelling influence upon his choice of appellant. In any event, we have carefully reviewed the record in its entirety and it is our independent determination that the photographic procedure employed by the police was not in derogation of any constitutional rights of the appellant. *Dobson v. State*, 24 Md. App. 644 (1975); *King v. State*, 18 Md. App. 266 (1973).

The appellant's contention that the trial judge improperly

instructed the jury with respect to the burden of proof in a murder trial has substantial validity for the instructions given by the trial judge, here, violated the teachings of *Mullaney v. Wilbur*, 421 U. S. 684 (1975) and *Evans v. State*, 28 Md. App. 640 (1975). The instruction that all homicides are presumed to be second degree murder and that the burden of proof was upon the appellant to reduce the offense to manslaughter was clearly wrong. The error, however, does not compel a reversal of appellant's conviction since he was convicted of murder in the first degree. In *Brown v. State*, 29 Md. App. 1, 19 (1975), this Court held, in an opinion authored by Judge Gilbert, that the error

> " * * * is cured by the verdict of murder in the first degree because it is clear that the State has met its ultimate burden and proved that the crime was committed with wilful, deliberate and premeditated malice, the essential ingredients of first degree murder. By so proving to the satisfaction of the trier of fact, at a jury or a non-jury trial, the State has disproved second degree murder. Similarly, an erroneous instruction concerning an accused's burden of lowering the offense from second degree murder to manslaughter is likewise cured because the State has negated to the satisfaction of the trier of fact, any mitigation. The net result, in such cases, of incorrect instruction where mitigation or 'hot blood' is not an issue fairly in the case, is that the instruction, at worst, is harmless beyond a reasonable doubt under *Harrington v. California*, 395 U. S. 250, 254, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967), and, at best, a gratuity given for the benefit of the accused and to which he was not entitled."

The appellant's defense at the trial below was not justification, provocation, self-defense or other mitigating circumstance, but simply the defense of alibi — he was not present when the crime was committed. As Judge Gilbert

poignantly stated in *Brown,* the incorrect instruction with respect to reducing the crime to manslaughter was a mere beneficial gratuity to which appellant was not entitled.

Appellant also asserts that the trial judge's instructions to the jury concerning the treatment to be accorded the testimony of an accomplice "does not pass muster." We disagree. His instructions in this regard were entirely adequate.

Finally, appellant complains that the prosecuting attorney made improper comments upon the evidence and drew erroneous conclusions therefrom which the trial judge compounded by his failure to give curative instructions to the jury. We have examined the closing arguments presented by the state in the light of the guidelines set out by the late Judge William J. O'Donnell in *Wilhelm v. State,* 272 Md. 404 (1974) and cannot find that the state's arguments exceeded the perimeters of legitimate argument announced therein. Moreover, the trial judge admonished the jury that "what counsel say to you about the facts or the law in this case is not binding upon you. What they say in their opening and closing statements is not evidence in the case, but only their opinion of what the evidence and the law is." We find no error.

*Judgments affirmed.*