831 A.2d 1101

**Tariq MALIK**

v.

**STATE of Maryland.**

**No. 2487, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 8, 2003.

310

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before SONNER, KENNEY and RAYMOND G. THIEME, JR. (Retired, specially assigned), JJ.

SONNER, J.

A jury in the Circuit Court for Baltimore City convicted appellant, Tariq Malik, of murdering five women in December, 1999. The circuit court sentenced Malik to what amounted to six consecutive life sentences, eight consecutive twenty-year sentences, and a consecutive thirty-year sentence. Malik presents five questions for our review.

I. Did the lower court err by denying Malik's motion to dismiss for violations of his right to a speedy trial?

II. Did the lower court err by granting the State's motion to exclude evidence tending to implicate Ronald McNeil in the murders and McNeil's statements implicating persons other than Malik?

III. Did the lower court err by denying Malik's motions for mistrial because of emotional outbursts by prosecution witnesses against Malik?

IV. Did the lower court err by refusing to instruct the jury on a theory of second degree murder?

V. Did the lower court err by allowing more than one conspiracy conviction?

We hold that Malik's first three challenges are without merit and affirm on those points. The court, however, erred in failing to instruct the jury on second degree murder and erred in failing to merge Malik's various conspiracy convictions. Consequently, we vacate Malik's convictions for first degree premeditated murder and the sentences attached to those convictions. We also vacate Malik's conviction for conspiracy to commit murder, and leave his remaining conspiracy convictions for appropriate action by the circuit court.

### *Factual Background* [1]

On the evening of December 5, 1999, Alvin Thomas arrived at the residence of his business partner, Adrian "Pie" Jones. Thomas and Jones operated a dinner business out of Jones's house in Baltimore City. As Thomas got out of his Nissan Maxima, Ismail Wilson and Robert Bryant grabbed him and took him into the basement. Travon McCoy and appellant, Malik, were also in the basement, and all four men were armed.

McCoy, Malik, Wilson, and Bryant demanded that Thomas give them drugs and money, while the four took his jewelry, jacket, cell phone, and pager. The four men next forced Thomas to call another business associate, Darnell Collins, because the four hoped to lure him to a nearby McDonald's restaurant and take his drugs and money as well. Before ambushing Collins, however, the four decided to go to the home of Mary McNeil Matthews ("Lo"), Thomas's sister, a person they knew to be a drug dealer, because they had conducted several drug transactions at her house. They believed large quantities of drugs and money were there for the taking.

At gunpoint, the four forced Thomas back into his Maxima, and the five drove to his sister's house at 3535 Elmley Avenue

---

1. Another factual account of the murders can be found in this Court's opinion regarding the trial of Malik's co-defendants in *Wilson v. State,* 148 Md.App. 601, 615–19, 814 A.2d 1 (2002), *cert. denied,* 374 Md. 82, 821 A.2d 370 and 374 Md. 83, 821 A.2d 371 (2003).

in Baltimore City. In order to get into the house, the four propped Thomas up at the door and rang the doorbell. Makisha Jenkins[2], Thomas's niece and Lo's daughter, opened the door and all five men entered the house. According to the trial testimony, once inside, the four men began assaulting Thomas's half-brother, Ronald McNeil. Also in the house at this time was Levanna Spearman, who was the girlfriend of Thomas's nephew.[3] After the four discovered that Lo was not there, they forced Thomas to call her and have her come home. About twenty minutes later, Lo arrived with Mary Collein, who was Thomas's mother, and Trennell Alston, the girlfriend of Ronald McNeil's son.

Bryant demanded that Lo give him drugs and took her upstairs. When they returned, Bryant was shoving money into his pockets. Ronald, Collein, Lo, Jenkins, Spearman, and Alston were then gathered in the basement. Bryant and Wilson forced Thomas out of the house, and Wilson remained with Thomas in his Maxima, while Bryant returned to the house. Just after Bryant returned, Thomas heard gunshots and then saw Bryant, Malik, and McCoy leave the house and return to the Maxima.

The four men and Thomas then drove to the McDonald's to meet Collins and, on the way, Bryant asked, "Who capped Lo?," and McCoy responded that he had. Collins arrived at the McDonald's a few minutes after Thomas and his abductors. Upon seeing Thomas with Wilson, Collins ran into the McDonald's. Wilson got a gun from Bryant and chased Collins. Working his second job, providing security at the restaurant, was off-duty police officer Warren Brooks. When he saw Bryant chasing Collins with the gun, he fired a shot at

---

**2.** The briefs and the indictments spell the victims' names differently. We have followed the spelling from the indictments, as we did in *Wilson,* 148 Md.App. 601, 814 A.2d 1.

**3.** Because several of the people involved in this case have the same last name, we will use their first names, when appropriate, to avoid confusion.

Wilson, which, although it missed, caused Wilson to flee from the scene and drop the gun.

Meanwhile, Thomas, at the behest of Bryant, was searching Collins's car for drugs and money. Thomas found an article of clothing, which he threw in Bryant's face and escaped by running into a nearby bar, the Dejavue Lounge, where he told an employee that someone had tried to rob him and was chasing him. Someone in the lounge called 911, and when police arrived, they took Thomas away.

The police investigation began at the residence where Thomas heard the gunshots; there they found all five women shot to death. Collein's body was in the kitchen and the other four women were in the basement. When police arrived, Ronald was at the house and was extremely emotional. After speaking with the officers, he began to scream that they were not doing enough. Because of his combative behavior, police handcuffed him and took him to the station, where they conducted a gunshot residue test, which came back positive. Police recovered ammunition, including spent cartridge cases, expended bullets, and live cartridges for a shotgun. Subsequent autopsies showed that some of the women had been shot with a shotgun and some with a handgun.

Police also conducted a search of Jones's home, the place were the events of December 5th began. In a room that Malik had occupied, officers found two boxes of different ammunition, and paperwork in the name of Malik, Bryant, and Wilson. James Waxter, a firearms identification expert, testified that some of the bullets fired at the house came from the gun discarded by Wilson at the McDonald's, and the spent shotgun shells matched those seized from Malik's room at Jones's house. Charles Peters, an F.B.I. agent, testified that metallurgical analysis of the bullets at the scene indicated that they either came from the ammunition boxes seized from Malik or from boxes manufactured at the same time.

Police arrested Malik on December 6th, when he arrived at a house that police were searching. The house was occupied by Rochelle Dorsey, who had helped Malik and Bryant get

rooms at a Pulaski Highway motel on the night of December 5th. Police found a bag of jewelry at Dorsey's house and seized a ring from Dorsey that Bryant had given her, which they later determined to have been stolen during the murders.

## Discussion

### I.

 Malik's first contention is that the circuit court erred in not dismissing his case for violation of his right to a speedy trial, as protected by the Sixth Amendment. This right does not entitle a defendant to an immediate trial, because the law permits reasonable time for normal preparation of the prosecution and the orderly processing of a case. *Fuget v. State*, 70 Md.App. 643, 649–50, 522 A.2d 1371 (1987). When a pretrial delay is "presumptively prejudicial," however, we employ a balancing test to determine whether the right of the defendant to a speedy trial has been violated. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The factors employed in the balancing test are: (1) the length of the delay; (2) the reasons for the delay; (3) the time when the defendant asserted the right to a speedy trial; and (4) the prejudice to the defendant. *Id.; see also State v. Henson*, 335 Md. 326, 332, 643 A.2d 432 (1994). "Because whether a period is presumptively prejudicial, or not, depends upon the length of a pre-trial delay, the first factor 'is to some extent a triggering mechanism.'" *Henson*, 335 Md. at 332–33, 643 A.2d 432 (citation omitted).

### A. Presumptively Prejudicial Delay

 Malik was arrested on December 6, 1999, and his trial finally began on November 8, 2001. This was a delay of twenty-three months, because we measure the length of delay from the date of arrest to the date of trial. *State v. Gee*, 298 Md. 565, 568, 471 A.2d 712 (1984); see also *Henson*, 335 Md. at 333–40, 643 A.2d 432 (discussing how a delay should be calculated when a prosecution has been instituted, terminated, and than reinstated). As the complexity of a case increases, so does the tolerable delay before a presumptive prejudice

finding. *See Barker,* 407 U.S. at 530–31, 92 S.Ct. 2182; *see generally Dalton v. State,* 87 Md.App. 673, 686, 591 A.2d 531 (1991). Even with the complexity of issues present in this case, we believe that a delay of twenty-three months was presumptively prejudicial, triggering the *Barker* balancing test. *See Doggett v. United States,* 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (holding that an eight-and-one-half year lag between indictment and arrest clearly triggered the *Barker* analysis); *State v. Ruben,* 127 Md.App. 430, 440, 732 A.2d 1004, *cert. denied,* 356 Md. 496, 740 A.2d 613 (1999) (finding a delay of eleven months "barely" of constitutional dimension, but nonetheless sufficient to trigger the *Barker* analysis).

### B. Reasons for Delay

"Closely related to the length of delay are the reasons for delay." *Dalton,* 87 Md.App. at 686, 591 A.2d 531. As the Supreme Court stated in *Barker:*

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant.

*Barker,* 407 U.S. at 531, 92 S.Ct. 2182 (footnote omitted).

In our view, the twenty-three-month delay in this case can be broken down into five segments. The first segment lasted from Malik's arrest on December 6, 1999, to the first scheduled trial date, July 6, 2000, a seven-month period. We must assume that the parties were involved in normal pre-trial preparation during this time. Generally, time spent in pre-trial preparation is neutral and not charged either to the State or the defendant. *Dalton,* 87 Md.App. at 687, 591 A.2d 531 (citing *Ferrell v. State,* 67 Md.App. 459, 463–64, 508 A.2d 490 (1986)). We also do not believe that this seven-

month period was excessive, given the complexity of the case, the number of victims, and varied crime scenes.

■ The second segment of time ran from July 6, 2000, to September 19, 2000. On June 12, 2000,[4] the court granted a postponement from July 6th to September 19th because the State was awaiting additional DNA evidence, fingerprint results, and the State required more time to comply with defense DNA discovery requests. In addition, Malik's and Bryant's attorneys were scheduled for motions in federal court on July 6th.[5] We believe this two-month period is chargeable to the State because the delay partially resulted from the State's failure to submit blood for DNA analysis in a prompt fashion. We will not weigh this period heavily against the State, however, because Malik is partially to blame for the delay and either reason alone would have delayed the trial.

■ The third segment runs from September 19, 2000, to January 23, 2001. We believe this four-month segment weighs against the State as well, though the weight we give this delay is only slightly more than we gave the previous delay. Here, Wilson requested the delay because he wanted more time to review recently disclosed DNA evidence and time to consult a DNA expert. It appears that Malik acquiesced in this delay because he wanted to be tried with his co-defendants. It also appears, however, that the only reason Wilson required a delay was because the State was somewhat tardy in submitting the DNA evidence for analysis and unwilling to disclose some of the results.

The fourth segment is an eight-month period between January 23, 2001, and September 4, 2001. The court granted this delay at a hearing on January 24, 2001. The court did not

---

**4.** We do not believe that Malik deserves the benefit of the time between June 12th and July 6th. This is because, had events transpired as originally envisioned by the scheduling judge at Malik's arraignment in March, 2000, Malik would have had to wait that period anyway.

**5.** At this point, all four co-defendants, Malik, Bryant, Wilson, and McCoy, were being tried together.

specify the good cause warranting the delay. The circuit. court did find good cause at a hearing on February 9, 2001. Because the record is devoid of any transcript of this hearing, we are unable to verify what the good cause was for purposes of determining who the time weighs against. As we explain, the reason for the delay and to whom it is attributed has little bearing on our final conclusion.

What we can discern from the record is that the State opposed this delay. The circuit court, however, elected to move the trial date because, although certain statements sought by the defendant were not *Brady*[6] material, he was still entitled to use the statements to mount a defense and needed time to explore his trial strategy.[7] The trial should have occurred in June, 2001, however, and was moved to September 4, 2001, only because Malik's counsel was involved in a capital murder case in Washington, D.C. Consequently, for purposes of our review, we will weigh the five-month period from January 24, 2001, to June 11, 2001, slightly against the State, and we will weigh the three-month delay from June 11, 2001, to September 4, 2001, slightly against Malik. We believe this is a proper weighing because the State, in its chronology of events outlined in its response to Malik's motion for dismissal, quoted the court's findings on February 9, 2001, "that the delay in this matter . . . shall be laid at the feet of the State." The State cites no reason to alter the lower court's conclusion and our independent review reveals none as well. We agree that a portion of this eight-month delay is the fault of the State.

■ The final segment of time is a two-month period between September 4, 2001, and November 8, 2001. The court granted this delay at the request of defense counsel, who was involved in a month-long capital murder trial in Washington,

---

6. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. The defense believed that certain statements made by Ronald supported the defense theory that persons other than the defendants had committed the murders.

D.C. Malik argues that this delay should be attributed to the State, because had the State acted promptly with the DNA analysis and not fought disclosure, the delay would not have been necessary. We will not attribute this delay to the State because the trial could have taken place in June 2001, and the only reason it did not was because of counsel's trial calendar.[8]

## C. Malik's Assertion of his Right

"Because the strength of the defendant's efforts will be affected by the length of the delay, asserting the speedy trial right weighs heavily in determining if the right has been denied." *Dalton*, 87 Md.App. at 688, 591 A.2d 531. The failure of a defendant to demand a speedy trial makes it more difficult to prove the defendant was deprived of the Sixth Amendment right. *Barker*, 407 U.S. at 531–32, 92 S.Ct. 2182. We have previously considered the assertion of the right to a speedy trial within five months of arrest as sufficiently prompt to weigh in favor of the defendant. *Dalton*, 87 Md.App. at 688, 591 A.2d 531.

Malik first asserted his right to a speedy trial by joining co-defendant Wilson's motion at the January 23, 2001 motions hearing. That was thirteen months after his arrest, decidedly not prompt, so we will weigh this factor heavily against him. *See Lewis v. State*, 71 Md.App. 402, 419, 526 A.2d 66 (1987) (weighing a twelve-month delay in asserting the speedy trial right against the defendant); *see also Berryman v. State*, 94 Md.App. 414, 422–23, 617 A.2d 1120 (1993) (twenty-month delay); *Jackson v. State*, 69 Md.App. 645, 655, 519 A.2d 751 (1987) (same).

## D. Prejudice to Malik

There are three interests to be considered by this factor: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the possibility that the delay

---

**8.** When the circuit court moved the trials of Malik's co-defendants forward, it severed his trial because counsel had committed to the capital trial in Washington, D.C.

hampered the defense. *Barker,* 407 U.S. at 532, 92 S.Ct. 2182. Although all three interests are important, the third one is the most important. *Id.* We will not discount, however, the effect the other two factors have on a defendant. We have previously summarized that these concerns create prejudice to the person and prejudice to the defense. *State v. Wilson,* 35 Md.App. 111, 127, 371 A.2d 140 (1977), *aff'd,* 281 Md. 640, 382 A.2d 1053 (1978).

Malik was incarcerated at the Supermax (MCAC) prison for almost the entire twenty-three-month period. He was confined in isolation for twenty-three hours each day and was not permitted to participate in any prison programs. We afford these circumstances some weight, although not a large amount because there is no allegation that the incarceration impaired the preparation of his defense. *See Ferrell,* 67 Md.App. at 465, 508 A.2d 490.

■■■ We believe that Malik is largely blameless for this delay and, as a consequence, we will afford his incarceration and the attendant anxiety associated with that incarceration in his favor. *Cf. Lewis,* 71 Md.App. at 419–20, 526 A.2d 66; *Jackson,* 69 Md.App. at 656, 519 A.2d 751. The weight we give this factor, however, is not as great as it would have been had Malik not caused a portion of the delay. Although the State discounts the effect of the lengthy pretrial delay on Malik, we are not so convinced, and believe that the incarceration caused anxiety that was not trivial. *Jackson,* 69 Md.App. at 655, 519 A.2d 751.

### E. Balancing of the *Barker* Factors

■■■ Our application of the *Barker* factors yields the following analysis:

(1) A delay of twenty-three months;

(2) Seven months of delay given neutral weight, eleven months of delay weighed slightly against the State, and five months of delay weighed slightly against Malik;

(3) The failure of Malik to assert his right promptly, weighed heavily against him; and

(4) Significant prejudice to Malik, but no prejudice to his defense.

Although the length of delay weighs against the State, none of that delay is weighed heavily. In addition, Malik is at fault for a good portion of the non-neutral delay. His failure promptly to assert his right also weighs against him. Although his pretrial incarceration was lengthy, there is nothing in the record to indicate that his defense suffered as a result.

We note that Malik's co-defendants raised the identical issue in their appeal to this Court. *Wilson*, 148 Md.App. at 613, 814 A.2d 1. Although we attached different weight to similar delays, we came to the same conclusion in *Wilson* that we reach here, "because the delay was occasioned, in part, by the request of [defense] counsel for postponements and because of the complexity and gravity of the case." *Id.* at 640, 814 A.2d 1.

## II.

Malik next contends that the circuit court erred when it did not allow him to present certain criminal acts of Ronald,[9] as well as certain hearsay statements he made. The nine pieces of disputed evidence can be divided into two categories: those occurring prior to the murders and those subsequent to the murders. The disputed evidence that occurred prior to the murders was: (1) Ronald's 1984 conviction for murdering his grandfather; (2) Ronald's barehanded assault on his niece; and (3) Ronald's 1993 conviction for assault with intent to murder his then girlfriend. Those pieces of disputed evidence that occurred after the murder were: (1) Ronald's alleged duct-taping of his son to a chair because he believed his son had information on the murderers; (2) Ronald's conviction for murdering a person he believed was involved in the murders; (3) Ronald's threats against a neighbor and her boyfriend; (4) Ronald's alleged use of a handgun to prevent his arrest by

---

9. Ronald, as we explained earlier, is the half brother of Adrian Thomas, whom the four abductors seized at the beginning of the evening of December 5.

police; (5) Ronald's statements to reporters that he had been left for dead in the basement by the murderers; and (6) Ronald's statements naming others he believed were involved in the murders.

The defense theory of the case was that Ronald was not completely candid with police in describing the murderers. In fact, the defense contended that Ronald was the gunman. In support of this theory, the defense wished to introduce the above evidence to show that Ronald was capable of inflicting harm on members of his family or those close to him. The court, reasoning that the circumstances of these other acts were totally dissimilar from the murders, denied the defense the use of all of this evidence. Instead, Malik had to rely on "the testimony that [Ronald] had emerged unharmed from the barrage of bullets and shotgun shells that killed [five women] and that [Ronald] had gunshot residue on his hands."

Because Malik wanted to use this evidence for substantive purposes, Maryland Rule 5–403 governed the circuit court's decision. The rule states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

This inquiry is left to the sound discretion of the trial judge and will be reversed only upon a clear showing of abuse of discretion. *Martin v. State*, 364 Md. 692, 705, 775 A.2d 385 (2001).

Evidence is relevant only when, "through proper analysis and reasoning, it is related logically to a matter at issue in the case, *i.e.*, one that is properly provable in the case." *Snyder v. State*, 361 Md. 580, 591, 762 A.2d 125 (2000). To find such a relationship, the court must be "satisfied that the proffered item of evidence is, on its face or otherwise, what the proponent claims that item to be, and, if so, that its admission increases or decreases the probability of the existence of a material fact." *Id.*

■ The factual circumstances of the proffered evidence were extremely remote to the facts of this case. At issue here is the murder of five women over drugs and money. The broad umbrella of comparison that Malik wished to attach between Ronald's past and the murders was simply unworkable. Regarding the murder of his grandfather, at least fifteen years passed between that murder and the December 1999 murders. Any possible relevance that it may have had was overwhelmingly outweighed by the unfair prejudice, confusion of issues, and probability of misleading the jury that its introduction would have created. *See generally* Md. Rule 5–609(b) (excluding impeachment evidence based on criminal convictions that are more than fifteen years old).

■ Ronald's other murder, his threats of assault against the neighbor and her boyfriend, his shooting at police, his statements to reporters, and his statements regarding the murders were properly excluded.[10] This evidence supported Ronald's belief that there were other people involved in the murders, and was an attempt by Malik to discredit his story about the events of the evening. Whether others were involved in the murders does not mean that Malik was not. Had the court allowed this evidence, it clearly would have confused the issues, misled the jurors, and allowed them to speculate about what really happened.

■ The court properly excluded the evidence of Ronald duct-taping his son, cutting his former girlfriend, and assaulting his niece. The duct-taping of his son and the slap of his niece were a far cry from the killing of five women. And the attack of his girlfriend with a knife, though quite serious, also does not compare with the cold-blooded murders for which

---

**10.** The parties spend a good portion of their briefs debating whether some of the statements made by Ronald were statements against penal interest. *See* Md. Rule 5–804(b)(3). Even if admissible, hearsay evidence is still subject to the exclusionary principles in Maryland Rule 5–403. In addition, as the State argues, the necessary showing under Rule 5–804(b)(3) has not been made. *See West v. State,* 124 Md.App. 147, 167–68, 720 A.2d 1253 (1998).

Malik stood trial. This evidence could arouse the jury's prejudice and hostility, as well as confuse the issues.

*Worthington v. State,* 38 Md.App. 487, 381 A.2d 712 (1978), which involved a conviction for assault with intent to murder, confirms our decision. In that case, the defendant sought to establish, during cross-examination of the victim, that the victim gambled and owed money to another person, so as to attribute a motive to the lender for firing the offending gunshots. The trial court prohibited the inquiry because, "[h]aving an outstanding debt and connecting [the lender] with the shooting [was] two different things."

We affirmed the ruling, reasoning:

While it is conceivable that the existence of animosity by some members of the community toward [the victim] could raise an inference that they, rather than appellant, were the perpetrators of [the victim's] injuries, we feel, as did the trial judge, that such a connection is, in the absence of real evidence pointing toward appellant's theory, totally speculative and tenuous. Were we to allow questioning into any and every matter calculated only to raise remote inferences vis-a-vis the issues at trial, we have no doubt that in many trials those issues would be obfuscated well beyond the point of recognition.

*Id.* at 498, 381 A.2d 712. *See also* JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 506(C) (3d ed.1999) (discussing Rule 5–403 and "needlessly confusing evidence"). Although the nine pieces of disputed evidence may have told the jury something more about Ronald, that information would not have assisted it in deciding Malik's guilt or innocence.

### III.

■ Malik's third challenge to his conviction is that the circuit court erred when it did not declare a mistrial after two emotional outbursts by the State's witnesses, Adrian Jones and Alvin Thomas. At the conclusion of her testimony, and as she was leaving the witness stand, Jones stated, "Tariq [Malik], you didn't have to put me through this. You put me

through this." In addition, as she testified and left the courtroom, she was visibly shaking and crying. Malik's counsel moved for a mistrial and suggested that the State had instructed its witnesses to be emotional on the stand. The court denied the motion, but issued a curative instruction.[11]

The next day, Thomas returned to the stand to continue his testimony from the previous day. The prosecutor asked Thomas to step down from the witness stand to view certain photographs of the crime scene and the deceased victims. Malik had objected to the viewing of the photographs by Thomas because he feared that Thomas would become emotional at viewing the photographs of his mother. That fear proved to be well founded. While viewing the photographs, Thomas began to cry. After returning to the stand, the following events occurred:

THOMAS: What the fuck is you looking at, nigger?

THE COURT: Wait a minute.

THOMAS: Bitch ass nigger.

THE COURT: Sir?

THOMAS: What the fuck is you (inaudible)—

THE COURT: Sir, would you take—gentlemen, would you take—gentlemen, would you take the witness out into the hall behind the courtroom for a few minutes, please?

THOMAS: I wish all of you mother fuckers would die.

THE COURT: Counsel approach.

Malik again asked for a mistrial, arguing that the level of emotion exhibited by Thomas would prejudice the jury. The judge, in denying the motion, stated:

Well, my—I heard what the witness said to the defendant before he left the courtroom, and I did not hear a threat. I heard names being called and accusations being made, and of course this is an emotional outburst.

---

11. "All right. Members of the jury, please disregard anything that the witness may have said or done after she left the witness stand."

It's not evidence and I would instruct the jury that it is not evidence, but I think it is that—in terms of his crying or his emotion when he identified the—made the identifications that's part of the witness' demeanor.

It's not uncommon at all for a witness to be moved to tears for one reason or the other on the witness stand, and I'm not aware that it's ever been considered as a reason for a mistrial, and I will instruct the jury to ignore the outbursts of the witness and tell them that it is not evidence in this case and may not be considered by them in their deliberations, and deny the motion for a mistrial. Okay?

Following Thomas's outburst, the court issued another curative instruction.[12] Malik argues that these outbursts "made it probable that the jury would convict [him] on the basis of speculation and emotion rather than on the basis of a reasonable analysis of the facts."

 A mistrial is an extraordinary remedy and is appropriate only when it is the only way to serve the ends of justice and is a manifest necessity. *See Miles v. State,* 365 Md. 488, 570, 781 A.2d 787 (2001), *cert. denied,* 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002); *Klauenberg v. State,* 355 Md. 528, 555, 735 A.2d 1061 (1999). Whether to grant a mistrial is left to the sound discretion of the trial judge, and we review the denials of such grants for abuse of discretion. *Morgan v. State,* 134 Md.App. 113, 141, 759 A.2d 306, *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000). The key to whether to grant a mistrial is in determining the prejudice to the defendant. *Watters v. State,* 328 Md. 38, 50, 612 A.2d 1288 (1992).

---

12. "I want to instruct you that the outbursts of the witness which you observed in this—just prior to the bench conference is not evidence in this case, and may not be considered by you in any way whatsoever in your deliberations in this case.

And, quite frankly, because of the emotional nature of this matter we may see similar remarks made. We hope not, but human beings being what they are that may occur, and I caution you that you will—you are only to consider those words which come from the witness on the stand under oath in deliberating in this case...."

■■■■ "Emotional responses in a courtroom are not unusual, especially in criminal trials, and manifestly the defendant is not entitled to a mistrial every time someone becomes upset in the course of the trial." *Hunt v. State,* 312 Md. 494, 501, 540 A.2d 1125 (1988). Because the trial court is in the "best position to evaluate any prejudicial effect" these outbursts had on the jury, we will generally defer to its judgment. *Id.* at 500–01, 540 A.2d 1125.

A murder trial for the death of five women clearly was going to cause a great deal of emotion, and the most that the court could do would be minimize it. We believe that the curative instructions were a reasonable and proper way to deal with the outbursts. *Cf. Hunt,* 312 Md. at 501, 540 A.2d 1125.

## IV.

### A. The Court's Failure to Instruct the Jury on Second Degree Murder

■■■■ Malik's fourth point of error is that the court should have instructed the jury on second degree murder. He argues that because Ronald was the only eyewitness to the murders, and he did not testify, the jury could have reasonably concluded that there was no evidence of premeditation. He cites the question the jury sent out during deliberations, "If you are with a person that commits a crime and are *unaware* of that person's intention, are you guilty of that crime," as proof that the jury questioned Malik's premeditated intent to kill.

In addition, so Malik asserts, a discussion between the trial judge and the assistant state's attorney about how to answer the jury's question indicates that they, too, were not sure if sufficient evidence of premeditation existed:

ASSISTANT STATE'S ATTORNEY: See, part of the problem, Your Honor, is and the reason we want the felony murder they could be thinking that he's gone to the house to commit the robbery and didn't intend to kill anyone.

THE COURT: I agree and I agree that's a separate charge [felony murder] which should be separately explained in light of this question because it could have bearing on the answer that they're seeking.

Nevertheless, the court responded to the jury question by merely repeating its earlier instructions on conspiracy, aiding and abetting, and felony murder. And in denying Malik's request for the instruction, the court stated:

All right, well, being aware of your arguments and your concerns and I understand your concerns, I'm not persuaded that there is any evidence of anything if believed other than first degree murder or first degree felony murder in this case, so I'm going to deny your instruction for second degree murder.

First degree murder is defined in the Maryland Code (2002), Criminal Law Article, section 2–201.

(a) *In general.*—A murder is in the first degree if it is:

(1) a deliberate, premeditated, and wilful killing;

(2) committed by lying in wait;

(3) committed by poison; or

(4) committed in the perpetration of or an attempt to perpetrate:

\* \* \*

(ix) robbery under § 3–402 or § 3–403 of this article;

A murder committed in the course of the set of enumerated felonies is murder in the first degree, regardless of whether the murder was reckless, accidental, or premeditated. Also, a participating felon, Malik, would be guilty of murder when an accomplice, Bryant or McCoy, committed a homicide while perpetrating one of the enumerated felonies. *See Campbell v. State,* 293 Md. 438, 442, 444 A.2d 1034 (1982). Theories of premeditated first degree murder and felony murder are exclusive charges and are not related. *McDowell v. State,* 31 Md.App. 652, 657, 358 A.2d 624 (1976).

The State elected to proceed only on theories of premeditated first degree murder and felony murder, and, as a tactic,

abandoned possible verdicts of second degree murder. In discussing whether the State could proceed in this manner, the following discussion occurred:

> THE COURT: My understanding of the law is the State picks the charges that it wishes to submit to the jury. The State rolls the dice when it only submits first degree murder, because if they don't find all the elements of first degree murder, then they must find him not guilty of murder.

> \* \* \*

> So they can't fall back to second degree or manslaughter if that count is not submitted, right.

> ASSISTANT STATE'S ATTORNEY: Yes. Your Honor, let me put on the record the State's understanding in this regard. [W]e believe then it becomes our call and to take the roll of the dice as I believe the Court more eloquently stated it, and choose to only submit the first degree murder.

▆▆ The issue of giving lesser included offense instructions in murder cases is a complicated balancing of the State's interest in determining how to prosecute a defendant and the defendant's right to a fair trial. *Hook v. State,* 315 Md. 25, 41, 553 A.2d 233 (1989). It is clear, however, that when proceeding under a theory of premeditated first degree murder, the State cannot choose to abandon the lesser charge of second degree murder.

▆▆ We begin with the proposition that second degree murder is not a lesser included offense of first degree felony murder. *Higginbotham v. State,* 104 Md.App. 145, 152, 655 A.2d 1282 (1995) (citation omitted). Second degree murder is, however, a lesser included offense of first degree premeditated murder. *See Hook,* 315 Md. at 30, 553 A.2d 233. Consequently, concerns of fundamental fairness require an instruction on second degree murder if the evidence would support such a charge. *Hook,* 315 Md. at 41, 553 A.2d 233; see also *Hagans v. State,* 316 Md. 429, 455, 559 A.2d 792 (1989):

In *Hook,* the State *nol prossed* the lesser offense of second degree murder and, as in this case, elected to proceed only on first degree murder charges. There was strong evidence, however, that Hook was intoxicated at the time of the crime. Although intoxication will not relieve someone of guilt, it may reduce the degree of the offense. *See Shell v. State,* 307 Md. 46, 59, 512 A.2d 358 (1986). The Court of Appeals concluded that if the evidence would support a lesser included offense, that offense must go to the jury. "The *Hook* rule is grounded in fairness, and designed 'to prevent jurors from convicting a defendant of the greater offense when they want to convict the defendant of some crime and they have no lesser option.'" *State v. Bowers,* 349 Md. 710, 722, 709 A.2d 1255 (1998).

Although fundamental fairness is the driving principle behind the *Hook* rule, "a plausible basis" must exist to support the conviction for the lesser included offense. *Id.* at 724, 709 A.2d 1255. As the Court of Appeals stated in *Bowers:*

> The reason underlying the requirement that there must be a bona fide factual dispute regarding one element that is necessary to the greater crime but not essential to the proof of the lesser crime is that the jury should be given the option of convicting on the lesser crime only when "it constitutes a valid alternative to the charged offense," thereby "preserv[ing] the integrity of the jury's role as a factfinding body." By the same logic, the jury's verdict must be a plausible one.

*Id.* at 723, 709 A.2d 1255 (citation omitted).

"The inquiry in assessing whether a defendant is entitled to a lesser included offense jury instruction is a two-step process." *Id.* at 721, 709 A.2d 1255. The first step is to determine whether the offense qualifies as a lesser included offense of the greater offense. *Id.* at 721–22, 709 A.2d 1255. As we have already indicated, second degree murder is a lesser included offense of first degree premeditated murder. *See Hook,* 315 Md. at 30, 553 A.2d 233. The second step requires the Court, based on the particular facts of the case,

to determine "whether there exists ... a rational basis upon which the jury could have concluded that the defendant was guilty of the lesser offense, but not guilty of the greater offense." *Bowers,* 349 Md. at 722, 709 A.2d 1255 (citations omitted).

Our task on review is "to determine whether the criminal defendant produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury rationally to conclude that the evidence supports the application of the legal theory desired." *Dishman v. State,* 352 Md. 279, 292, 721 A.2d 699 (1998). We are interested in whether some evidence exists to support the request for the jury instruction. As the Court of Appeals reiterated in *Roach v. State,* 358 Md. 418, 749 A.2d 787 (2000):

> Some evidence is not structured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond a reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant.

*Id.* at 428, 749 A.2d 787 (citing *Dykes v. State,* 319 Md. 206, 216–17, 571 A.2d 1251 (1990)).

Our review of the record leads us to conclude that the circuit court did err in failing to give the jury an instruction on second degree murder. The discussion between the State and the judge regarding the jury's question illustrates that doubt existed as to whether Malik went into the house with the intent to murder any of the five victims. Moreover, none of the witnesses presented by the State at trial were in the house when the murders occurred, and Thomas based his testimony on a conversation, which occurred in the car between McCoy and Bryant that indicated that McCoy shot Matthews.

The evidence could support the conclusion that Malik did not premeditate the murders, but, rather, that he committed them in response to some event that occurred in the house after the co-defendants took Thomas to his Maxima. Given

these circumstances, Malik was entitled to an instruction on second degree murder. As in *Hook*, the lack of a second degree murder instruction presented a *Hobson's*[13] choice for the jury; either convict Malik for first degree murder or set Malik free. *See Hook*, 315 Md. at 38, 553 A.2d 233. Our review, however, does not end because Malik's convictions are subject to the harmless error analysis.

### B. Harmless Error

■ The verdict sheet reveals that the jury convicted Malik of both first degree premeditated murder and felony murder of Spearman, Jenkins, Collein, Alston, and Matthews. At sentencing, the court asked the State under which theory of murder it wanted Malik sentenced: first degree premeditated murder or felony murder. The State, unfortunately, elected to have Malik sentenced under the theory of premeditated first degree murder. Had the State elected to have Malik sentenced for felony murder, the absence of a second degree instruction would have been harmless.

Instead, on January 14, 2002, the court sentenced Malik as follows:

I. The death of Levanna Spearman

A. First degree premeditated murder—Life without parole;

B. Use of a handgun in the commission of a felony—20 years, consecutive to the life sentence;

II. The death of Makisha Jenkins

A. First degree premeditated murder—Life without parole;

---

13. The choice is named after an English liveryman, Thomas Hobson, who required every customer to take the horse nearest to the door. Essentially, it is the forced acceptance of something objectionable because the alternative is getting nothing or, put another way, something that must be accepted because no real alternative exists. *Hook*, 315 Md. at 38 n. 18, 553 A.2d 233 (citation omitted).

B. Use of a handgun in the commission of a felony—20 years, all sentences consecutive to each other and to all other sentences imposed;

III. The death of Mary Collein

A. First degree premeditated murder—Life without parole;

B. Use of a handgun in the commission of a felony—20 years, all sentences consecutive to each other and to all other sentences imposed;

IV. The death of Trennell Alston

A. First degree premeditated murder—Life without parole;

B. Use of a handgun in the commission of a felony—20 years, all sentences consecutive to each other and to all other sentences imposed;

V. The death of Mary McNeil Matthews

A. First degree premeditated murder—Life without parole;

B. Use of a handgun in the commission of a felony—20 years;

C. Conspiracy to murder—Life;

D. Robbery with a deadly weapon—20 years, all sentences consecutive to each other and to all other sentences imposed;

VI. Alvin Thomas

A. Robbery with a deadly weapon—20 years;

B. Use of a handgun in the commission of a felony—20 years;

C. Kidnapping—30 years, all sentences consecutive to each other and to all other sentences imposed.

Because of our conclusion regarding the court's error in failing to instruct on second degree murder, we must vacate

the convictions and sentences for first degree premeditated murder and conspiracy to commit murder. We conclude, however, that this error did not infect the other convictions, including Malik's convictions for felony murder. Vacating the sentences, as we must, leaves Malik with a remaining sentence of 190 years.

In *Hook*, after reversing the murder convictions for lack of instruction on second degree murder, the Court of Appeals went a step further and reversed the armed robbery and handgun convictions, stating:

We are of the opinion that the lack of fundamental fairness, when related to the overall fairness of the entire trial, permeated the deliberations of the jury with respect to all of the charges. We are mindful of the context in which the jury deliberated. Hook confessed that he shot and killed two persons and stole their property. These admissions were buttressed by the testimony of two eyewitnesses. Hook made no attempt to refute or dispute that evidence (Hook offered no evidence at the trial). Proof of the corpus delicti and Hook's criminal agency stood bright and clear. So the jury was called upon to render judgment on an admitted murderer and thief with no alternative but to find him guilty or not guilty of murder in the first degree and guilty or not guilty of armed robbery. We are unable, upon our own independent review of the record, to declare a belief beyond a reasonable doubt that the errors in the entry of the nolle prosequi, the absence of instructions on second degree murder, and the refusal of the trial court to allow defense counsel to argue with respect to that offense in no way influenced the verdicts. We think that the errors tainted all of the verdicts. They not only affected the finding of guilt as to premeditated murder, but also the convictions on felony murder, the armed robberies, and the handgun offense. We are not satisfied that the test laid out in *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, (1976), has been met so as to render the errors harmless. We are convinced that there is a reasonable possibility that the

errors may have contributed to the rendition of all of the guilty verdicts. Hook is entitled to a new trial.

*Hook,* 315 Md. at 42, 553 A.2d 233 (footnote omitted).

Malik presents a different situation from that which the Court of Appeals dealt with in *Hook.* The thrust of Malik's argument is that he did not premeditate the murder of the five victims when he and his co-defendants went to the house, but the evidence does not support the notion that Malik lacked the specific intent to commit armed robbery at the house or that he did not use a handgun while committing the felony. The same rationale applies to his conviction for kidnapping.

Our independent review of the record convinces us that the taint present in the first degree premeditated murder conviction does not infect Malik's other convictions. Unlike in *Hook,* no evidence exists that negates Malik's specific intent to commit the other crimes, including felony murder. Consequently, we conclude that, as to Malik's convictions, other than first degree premeditated murder and conspiracy to commit murder, the court's failure constitutes harmless error.

## V.

Malik's final point of error is that the jury convicted him of eight counts of conspiracy to commit various crimes. He argues that because the State's "evidence proved no more than a single agreement, only one conviction for conspiracy was authorized by law." The State agrees. *See Jordan v. State,* 323 Md. 151, 161, 591 A.2d 875 (1991). Under these circumstances, while we would normally reverse all of Malik's conspiracy convictions, except conspiracy to commit murder because it carries the heaviest penalty, *Henry v. State,* 324 Md. 204, 240, 596 A.2d 1024 (1991), circumstances here are not "normal."

We have already vacated Malik's premeditated first degree murder charges, and, consequently, must also vacate his five conspiracy to murder counts. We leave untouched Malik's two convictions for conspiracy to rob with a deadly weapon and conspiracy to kidnap. We shall leave to the circuit court

on remand the task of taking appropriate action regarding these various conspiracy counts. The circuit court's decision will be governed, to some degree, by what the State elects to do with regard to Malik's vacated premeditated first degree murder convictions and sentences.

JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY FOR FIRST DEGREE PREMEDITATED MURDER AND CONSPIRACY TO COMMIT MURDER VACATED; CASE REMANDED FOR SENTENCING ON FELONY MURDER AND FURTHER ACTION, IN ACCORDANCE WITH THIS OPINION; JUDGMENTS OTHERWISE AFFIRMED.

COSTS TO BE PAID 3/5 BY APPELLANT AND 2/5 BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.