# LARRY RAYMOND WORTHINGTON *v.* STATE OF MARYLAND

[No. 299, September Term, 1977.]

*Decided January 12, 1978.*

488

The cause was argued before GILBERT, C. J., and MORTON and COUCH, JJ.

*Robert W. Baker, Jr., Assigned Public Defender,* with whom were *Merriman, Crowther & Merriman* on the brief, for appellant.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Stephen Tully, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

Appellant, Larry Raymond Worthington, was convicted by a jury sitting in the Criminal Court of Baltimore (Grady, J., presiding) of assault with intent to murder and unlawful use of a handgun. Concurrent sentences of 25 years and 15 years were imposed.

According to the victim, Michael Bray, he and his friend, Catherine Roppelt, were driven to the home of Thomas Goldsborough in Dundalk, Maryland, by appellant and his girlfriend, arriving sometime after 3 a.m. on January 26, 1976. After "smoking a few bowls of pot" Bray was invited to go outside with Goldsborough and appellant, ostensibly to show him "something by the railroad tracks." Bray testified:

> "We walked down to the railroad tracks. He [appellant] said, 'Look here.' He showed me something. He pointed to the railroad cars, line of boxcars like this. I went to look like this. And he had a pistol. Shot me right in the back of the head once. I went down to the ground, stunned me. Busted my skull in the back. First I didn't know what happened. It's quick. And it was a flash and knocked me straight to the ground. All I saw was red and like I was half dizzy and knocked out. I shook it off. It was only a matter of seconds. And blood was

running on my face. And I looked up, and he was holding a pistol."

Later, Bray testified that he "was shot three times in the head and once in the back." On cross-examination Bray stated:

"When I was in the hospital, when I was first shot, I wanted to take matters in my own hands. I wanted to kill Mr. Worthington. Mister — I'm being respectful to him. But after I thought about it, my family, mother and father, everybody talked to me, said it's best I go to the courts and let the police handle it rather than kill and go to jail. I have been in jail. I don't want to go back. When I was first in the hospital, I was mad, of course. I was in pain. I was in misery. And I told the police officer that I would take care of matters myself. That was the first statement. The second time I told them I know who did it, I will take care of it."

Bray denied, however, that he told the police that he did not know who shot him. Appellant attempted to impeach this statement with the testimony of Officer William Chaffinch of the Baltimore City Police Department who stated that when he interviewed Bray on the morning of January 26, 1976, Bray told him that "he did not know [who shot him] as he was shot from the rear."

Endeavoring further to impeach Bray's credibility, appellant called Leroy Brunner, Jr., a licensed private investigator, to the witness stand. Brunner stated that he interviewed and took a statement from Bray on April 26, 1976. Replying to questioning from appellant's counsel, Brunner read the following, apparently inconsistent excerpts from Bray's statement into the record:

" 'I believe Goldsborough * * * pushed me forward. Then I got shot in the back of the head first, then shot two more times in the head and once in the back. I went down on my knees. When I got myself together and had almost went unconscious, I turned around and saw Goldsborough and Worthington' —

now he has the correction, 'looking at me, then they ran.' "

* * *

" 'After I was operated on, police interviewed me again. I told them that I didn't have anything to say. I didn't know who did it. I made a statement saying two unknown white guys jumped me from behind, and I didn't get a good look at them.' "

Through the testimony of Brunner, appellant also attempted to impeach the credibility of Bray's friend, Catherine Roppelt, who, as a State's witness, had previously stated that appellant was present and had a gun on the night of the shooting. Brunner read an excerpt from an interview with Ms. Roppelt which he had conducted on August 31, 1976, in which she stated that she "was rather intoxicated at the time and really not capable of knowing what was going on."

On cross-examination of Brunner the State called for the admission of the original statements of Bray and Ms. Roppelt in their entirety. After deleting several extraneous sentences, the statements were then admitted into the record over appellant's objection.[1] In his argument to the trial judge concerning the admissibility *vel non* of the entire statement, the prosecutor stated:

"The State's position, the defense has put in select portions of those two statements to show prior inconsistent statements. I'm offering it in evidence as prior consistent statements as to all the questions which he so carefully avoided bringing up, and I think I have a right to do that. He has waived any contention he has as to work product."

Appellant now contends that the admission of the Bray and Roppelt statements in their entirety constituted reversible error. He first argues that the statements were not admissible as prior consistent statements, as argued by the prosecutor, because they were "made long after the motive

1. For the sake of convenience, we shall simply refer to what was admitted at this time as the entire statement.

to fabricate existed." *See, e.g., Kelly v. State,* 151 Md. 87 (1926); *Lanasa v. State,* 109 Md. 602 (1909); *Boone v. State,* 33 Md. App. 1 (1976). We do not agree for we think both statements were properly admitted under the doctrine of "verbal completeness." The doctrine was discussed by the late Chief Judge Brune in *Feigley v. Balto. Transit Co.,* 211 Md. 1 (1956). There he set forth, at pages 9-10, the following statements from Wigmore on Evidence, 3rd Ed., Vol. VII, § 2114:

> " '(4) When a *witness* of a *party* has been *impeached* by *prior utterances* showing *bias* or *self-contradiction,* fairness requires that he be allowed to explain away their effect, if he can (*ante,* Sections 952, 1044 and 1058). One way of explaining may be to give the remainder of what he said at the time. Here, then, the putting in of the explanatory parts is justifiable equally on two principles * * *.'

And in § 2115, the author continues:

> 'The general phrasing of the principle, then, is that when any part of an oral statement has been put in evidence by one party, the opponent may afterwards (on cross-examination or re-examination) put in the remainder of what was said *on the same subject at the same time.* This phrasing leaves something to be desired in definiteness, but it is practically applied without much difficulty and with little or no quibbling.
>
> 'Its most common application is to *conversations* in general, including the *admissions of an opponent* and to *inconsistent statements of a witness* used in impeachment * * *.' " [2]

In the case at bar, when appellant sought to impeach the credibility of Bray and Ms. Roppelt by their prior utterances, it was fair and proper to permit the State, under the doctrine of "verbal completeness," to introduce their prior statements

---

2. The rule applies to written as well as oral statements. *See* McCormick, Evidence 131 (2d ed. 1972).

in their entirety. *See* 3A Wigmore, Evidence § 1045 (Chadbourn rev. 1970); 7 Wigmore § 2113 (3d ed. 1940).

Appellant also contends that the following excerpt from the Roppelt statement is inadmissible by virtue of the rule prohibiting the admission of hearsay:

> " 'Question: Did anyone tell you who shot Bray?
> 'Answer: Bray told me in the hospital Larry did it. I was asked was that the guy who had the peg leg and Mike said, yes. I asked why he shot him. He wouldn't say. I asked him if he was going to press charges. Mike said he wasn't going to press charges. I asked why. Mike said he wanted to get Larry himself. I told him that was crazy, let the police handle it.' "

In our view, this contention likewise runs counter to the rule of completeness. McCormick, in his work on Evidence 131 (2d ed. 1972), does point out that the element of hearsay might add new considerations to the rule of completeness and, accordingly, notes that "the trial judge should exclude [such statements] if he finds that the danger of prejudice outweighs the explanatory value." Our review of the record convinces us that the trial judge did not abuse his discretion in admitting the Roppelt statement in its entirety. Indeed, a perusal of Roppelt's statement reveals the possibility, by reason of its attention to detail, that when she stated that she was "intoxicated and not really capable of knowing what was going on," she did not mean to imply, as she testified on cross-examination, that she did not remember what happened at the apartment. By allowing the jury to examine all relevant portions of her statement, the trial judge enabled it to reach an intelligent conclusion as to her intoxication and perception on January 26, 1976. Certainly, in balance, we cannot say that its prejudicial effect outweighed its explanatory value.

Appellant argues that the admission of Ms. Roppelt's statement violated his right to confront all witnesses against him as guaranteed by the sixth amendment to the United States Constitution and article 21 of the Maryland Declaration of Rights. In concluding that this contention is

without merit we observe, once again, that Roppelt's statement was taken by Brunner, a private investigator hired by appellant. As such, it strains our imagination to argue that appellant did not have an opportunity to cross-examine her since, in effect, her entire statement was given in response to appellant's own out-of-court questioning. Moreover, once appellant initiated questions concerning Ms. Roppelt's statements to Brunner, it is clear that he could not thereafter "invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *United States v. Nobles*, 422 U. S. 225, 241 (1975).

Appellant next contends that the Bray and Roppelt statements were inadmissible because they were the work product of his trial counsel. In *Hickman v. Taylor*, 329 U. S. 495 (1947), the Supreme Court recognized that a privilege existed rendering certain materials prepared by an attorney in anticipation of litigation non-discoverable and inadmissible at trial. The Court reasoned, at 510-11:

> "In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. * * * This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways — aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and

in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served."

It is clear that the work-product privilege, when available, also extends to investigators employed to assist in preparation for trial. *United States v. Nobles, supra,* at 238.

The State, citing *Nobles,* counters with the proposition that even if the work-product theory were initially applicable to appellant and his counsel, it was waived as a result of appellant's witness, Brunner, having read into evidence selected portions of Bray's and Ms. Roppelt's statements. The factual posture of *Nobles* is remarkably similar to the case *sub judice.* There, as here, "defense counsel sought to impeach the credibility of key prosecution witnesses by testimony of a defense investigator regarding statements previously obtained from the witnesses by the investigator." 422 U. S. at 227. There, as here, the trial judge, in admitting the challenged evidence, ruled that the investigator's report was relevant to the critical issue of credibility. While recognizing the continued validity of the work-product doctrine, the Court, in affirming the trial court's ruling, engrafted upon it a waiver exception applicable under appropriate circumstances. It said, at 239-40:

"The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived. Here respondent sought to adduce the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses. Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters

reasonably related to those brought out in direct examination."

*See generally* 35 A.L.R.3d 412, § 33.

It is only too clear that the admission of selected excerpts, carefully drawn from a larger work, could conceivably create an inaccurate impression as to the meaning of what was actually said. As previously noted, if denied an opportunity to examine all relevant portions of the statements, the jury would be unable to assess intelligently the credibility of Bray and Ms. Roppelt.[3] Accordingly, we concur with the State's assertion that appellant waived his privilege when he elected to have Brunner testify as he did.

Finally, appellant contends that the trial court erred in limiting his cross-examination of Bray concerning Bray's gambling debts. In this regard the following colloquy ensued at trial:

"Q. [Mr. Byrd, defense counsel] You gamble. Do you know Jack Williams, Mr. Bray?

A. Yes, I do.

Q. He is a gambler, too; isn't he?

A. Yes, he is.

Q. In fact, you have an outstanding —

MR. TULLY [Prosecutor]: Objection, Your Honor. Let's approach the bench.

(The following proceedings took place at the bench out of the hearing of the jury:)

MR. TULLY: Your Honor, I have an objection to any questions — defense counsel is going into prior criminal activities, prior record which is not followed in the Supreme Court Maryland decision, that question being, have you ever been convicted of a crime where you were represented by counsel when you were under the age of eighteen. If counsel is going into that area, then I would ask for an

---

3. It appears to us that the work-product waiver doctrine is, in effect, a specific application of the aforementioned completeness rule.

instruction in motion limine to that now. If not, ask for a proffer of what area —

MR. BYRD: I'm not going into that. I'm about to demonstrate the motive for killing one, Mr. Jack Andrews, whatever —

THE COURT: Williams, I thought you said.

MR. BYRD: Williams, who has an outstanding debt of sixteen hundred dollars, and I have investigators working on it. And I can establish he has an outstanding debt of sixteen hundred dollars to this man.

THE COURT: Having an outstanding debt and connecting this man with the shooting are two different things. He may owe sixteen hundred dollars to Commercial Credit or to some savings —

MR. BYRD: The whole pattern is to be able to establish that there are a lot of people who would like to hit him in the head.

THE COURT: Are you going to have any evidence to bring this man Williams onto the scene?

MR. BYRD: I have investigators out now.

THE COURT: I'm not going to —

MR. BYRD: We have already obtained a statement from him.

THE COURT: From whom?

MR. BYRD: Williams.

THE COURT: That he was there and shot him?

MR. BYRD: No, that he had an outstanding debt of sixteen hundred dollars.

THE COURT: I'm not going to — that's just a red herring unless it's connected with something. You can ask him if he owes sixteen hundred dollars to a lot of people.

MR. BYRD: Don't you think the jury should be permitted to, for me to be able to argue there were many people that might have wanted to shoot him and that he has reason for picking this man out

because he didn't want to divulge his activities in other fields? I'm also going to go into the drug situation, because he is a drug dealer.

THE COURT: He brought that up. But just to say that now there are five other people wandering around the city of Baltimore that might want to do him harm is no evidence that they did.

MR. BYRD: If my premise in the case is, Your Honor, that he knows who shot him but not this man —

THE COURT: Maybe you'll get it in a more logical fashion, but just bringing it out of left field at this point, the objection is sustained."

It is, of course, clear "that the right of cross-examination is included in the right of an accused in a criminal case to confront the witness against him." *Pointer v. Texas,* 380 U. S. 400, 404 (1965). It is equally clear, however, that the questions propounded on cross-examination must be reasonably related to the issues at trial. The Court of Appeals, in *Dorsey v. State,* 276 Md. 638, 643 (1976), set forth the standards by which we are guided when evaluating the relevancy of the questions asked on cross-examination.

"The real test of admissibility of evidence in a criminal case is 'the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue.' *MacEwen v. State,* 194 Md. 492, 501, 71 A. 2d 464, 468 (1950); *Pearson v. State,* 182 Md. 1, 13, 31 A. 2d 624, 629 (1943). In *Kennedy v. Crouch,* 191 Md. 580, 585, 62 A. 2d 582, 585 (1948), our predecessors stated it to be 'an elementary rule that evidence, to be admissible, must be relevant to the issues and must tend either to establish or disprove them.' Evidence which is thus not probative of the proposition at which it is directed is deemed 'irrelevant.' *See* C. McCormick, *Evidence* § 185 at 435 (2d ed. 1972). *See also* 1 J. Wigmore, *Evidence* § 28 at 409-10 (1940 ed.); Wharton's *Criminal Evidence* § 151, *supra,* at 275;

29 Am.Jur.2d *Evidence* § 251 (1967); 31A C.J.S. *Evidence* §§ 158, 159 (1964)."

Moreover, "[t]he allowance or disallowance of certain questions on cross-examination normally is left to the sound discretion of the trial judge." *Beasley v. State,* 271 Md. 521, 527 (1974).

Appellant posits that the trial judge, in refusing to permit a delving into Bray's gambling debts, prejudicially denied him an opportunity to effectively cross-examine Bray. We disagree. While it is conceivable that the existence of animosity by some members of the community toward Bray could raise an inference that they, rather than appellant, were the perpetrators of Bray's injuries, we feel, as did the trial judge, that such a connection is, in the absence of real evidence pointing toward appellant's theory, totally speculative and tenuous. Were we to allow questioning into any and every matter calculated only to raise remote inferences vis-à-vis the issues at trial, we have no doubt that in many trials those issues would be obfuscated well beyond the point of recognition. In our view, the trial judge here properly acted, upon objection, to prevent such an occurrence. We see no abuse of discretion.

*Judgments affirmed; costs to be paid by appellant.*