REPORTED
IN THE COURT OF SPECIAL APPEALS
No. 1958
September Term, 2014

_____

BALDEO TANEJA

V.

STATE OF MARYLAND

_____

Woodward,
Graeff,
Sharer, J. Frederick
    (Retired, Specially Assigned),

JJ.
_____

Opinion by Sharer, J.
_____

Filed:  November 30, 2016

Preeta Gabba was shot three times at close range, resulting in her death, while walking in Germantown, Montgomery County, at about 7:45 on the morning of October 12, 2013. Her former husband, Baldeo Taneja, and his wife, Raminder Kaur, were charged in Gabba's murder. They were tried together and convicted by a jury of first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, and use of a handgun in the commission of a felony.[1]

In his appeal, Taneja raises a single issue:

> Whether the trial court violated Taneja's due process right to present a defense by excluding several defense witnesses who were present in the court and ready to testify concerning the defense's theory of the crime[.]

Finding no abuse of discretion in the court's rulings, we shall affirm the judgments of the circuit court.

## I. FACTS

The State's theory of prosecution was that Taneja and Kaur conspired to kill Gabba, and that it was Kaur who fired the fatal shots. The State's case was largely circumstantial and centered on motive and opportunity. The State produced evidence that the gun used to kill Gabba was found in the rear seat of Taneja and Kaur's car 30 hours after the murder, and that Taneja had purchased the gun five weeks earlier. The defense argued lack of criminal agency and, more particularly, that others had motive to kill Gabba.

Viewing the evidence in the light most favorable to the State, the following was adduced at Taneja's trial.

---

[1] Following a post-trial motions hearing, Kaur was granted a new trial.

Gabba and Taneja were married in India in 2002, and continued to live there for several years. In 2006, Taneja moved to the United States; Gabba followed in 2009. They lived in the Germantown area, but not together. Two years later, Gabba and Taneja divorced, and soon afterward Taneja married Kaur and moved to Nashville, Tennessee. Gabba remained in the Germantown area and moved to a condominium on Crystal Rock Drive.

On the morning of Gabba's murder, she was en route to her job, walking from her home to the bus stop, as she had done regularly for the preceding three years. Three eyewitnesses testified to the events at the murder scene.

Elena Komarova was driving her teenage son to his school in the 19700 block of Crystal Rock Drive, a residential area, when they heard several gunshots. Komarova slowed her car and saw two women ahead of her. One of the women, later identified as Gabba, started crossing the street in the middle of the block, while the other woman was close behind her. As Gabba fell into the street in front of Komarova's car, the second woman ran away. Komarova and her son described the woman who ran away, in part, as wearing a bright orange scarf. They initially described both women as African-American, although, at trial, both were less positive about their race. Neither saw anyone else in the immediate area at the time.

A man living in an apartment about 100 yards from where the shooting occurred testified that he heard gunshots and looked out his window. He saw a woman, later identified as Gabba, lying on the ground, and ten feet away another woman, who exhibited a slight limp, was running away. The witness described the woman who was running away

2

as in her late 40's or early 50's with "brownish" skin color and wearing a bright head scarf. Like the Komarovas, he initially told the police that the woman was African-American, but, at trial, was less positive of her race.

Suspicion quickly fell on Taneja and Kaur. Several hours after the murder, around 3:30 p.m., Montgomery County Police Department homicide detectives called Taneja's cell phone, but it went directly to voice mail, as did several additional calls. Warrants were obtained for Taneja and Kaur, who were arrested in Tennessee around 2:00 p.m. the day following the murder, as they were driving away from their home. One of the detectives observed that Kaur walked with a limp.

The police searched the car and recovered a backpack containing a wig, black hair dye, a black hoodie, and a plastic bag. In the plastic bag was a .357 Ruger LCR revolver, which later testing and examination determined to be the murder weapon. The plastic bag also contained a holster for the .357 Ruger, and a 100 Ruger revolver. Inside Kaur's purse the police found a note in her handwriting that read: "You calm down. We are now in Tennessee near my home." A global positioning system device (GPS) was recovered from the front console of the car. Inside Taneja's wallet was a piece of paper on which Kaur had written Gabba's address.

A search of Taneja's residence recovered documents with a note on top in Kaur's handwriting that read, "Dragon story and other court documents." The police also recovered a composition notebook with different handwriting that read, in part, "No brass, no evidence."

3

A medical examiner testified that Gabba had been shot three times in the upper chest and abdomen. The bullets had entered from the left side and traveled toward the right; two of the bullets entered the front part of her body, one entered from the back. Although two of the wounds were "rapidly fatal," the medical examiner testified that Gabba could have possibly walked several steps before falling.

Two firearm and tool mark identification experts testified that the three bullet specimens recovered from Gabba's body were all fired from the .357 Ruger LCR revolver that was recovered from Taneja's car. Taneja's DNA was found on both guns seized from his car.

The State also presented evidence to support its theory of Taneja's and Kaur's motive to kill Gabba, including that, in 2009, when Gabba moved to the United States from India, Taneja and Gabba were experiencing marital discord. While Gabba lived in a condominium in Germantown with one of Taneja's sons, Taneja and Kaur lived nearby and held themselves out as husband and wife.

In 2010, Gabba and Taneja began divorce proceedings, which became "very contentious" even though they had little property and no children together. The State introduced evidence that during the divorce proceedings, Taneja asked his son and Kaur to spy on Gabba, and that Taneja referred to Gabba as "Dragon Lady," as did his son and Kaur. At one point during the divorce proceedings, Gabba, acceding to Taneja's demand, left the family home. She later returned, pursuant to a court order, to find that Taneja had erected walls so she had access only from the entry door to her bedroom.

The State presented evidence that, although the divorce became final in July 2011, Taneja failed to honor their divorce agreements, and their interactions continued to be acrimonious. Indeed, at the time of Gabba's murder, Taneja still had not transferred their property in India as required by the divorce settlement, despite several requests by Gabba.

Additional evidence was offered by the State relating to Taneja's agreement, as part of the divorce settlement, to pay alimony in the amount of $2,400 each month for three years. Alimony was to terminate upon the death of either party. By February 2013, Taneja had fallen three months behind in his alimony obligation, prompting Gabba to send several demands for payment, via e-mail. Eventually, her attorney filed a contempt petition against Taneja who, in response, filed a counterclaim for $100,000. The contempt hearing was scheduled for October 10, 2013, two days before the murder, but several days before the hearing, their attorneys negotiated an agreement whereby Taneja agreed to pay the arrears within 90 days.

The State also presented evidence of Taneja's and Kaur's opportunity to kill Gabba.

About five weeks before Gabba's murder, Taneja attended a day-long gun training class in Tennessee. The class included four hours of instruction and four hours of shooting range experience that would allow him to obtain a "handgun carry permit." In his testimony, the instructor recalled that, at the first class, Taneja entered the classroom with a woman and sat in the last row. When the woman was asked to leave because she had not paid to attend the class, Taneja moved to the first row. The instructor particularly remembered Taneja because he took "a ton of" notes. Among the instructor's recommendations to the class participants was that they purchase a revolver rather than a

5

semiautomatic, because the latter requires much more training for accuracy than a revolver. He further remembered telling the class that a semiautomatic "spits out" shell casings that can later be matched to the gun, but a revolver does not.

On September 28, 2013, two weeks before the murder, Taneja purchased two revolvers from a gun store in Tennessee: a .357 Ruger LCR, which was described as a snub- nosed revolver designed with a "concealed hammer" so it would not get hung up on clothing, and a 100 Ruger GP. Additionally, Taneja purchased a holster for the .357 and ammunition for both guns. Kaur was present in the store when Taneja purchased those items.

Around 7:00 p.m. on October 11, the night before the murder, Taneja and Kaur checked into the Red Roof Inn in Germantown, about eight miles from where Gabba was shot. From the GPS recovered from Taneja's car, the police learned that at 9:58 a.m. the next morning – October 12 – the GPS device traveled toward the District of Columbia.

The evidence disclosed that both Taneja and Kaur were involved in Amway distribution and sales, Taneja since the early 1990's. On the weekend of October 11-13, 2013, Amway held a "Free Enterprise" weekend conference at the Washington Hilton, involving thousands of Amway members. The event started Friday night at 6:00 p.m. and lasted until Sunday at 3:45 p.m. Taneja's Amway sponsor testified that Taneja was aware of the importance of attending the conference.

At 10:44 a.m. on the morning of the murder, Taneja purchased two tickets for the conference. About 30 minutes later, the GPS revealed a stop near the Washington Hilton, a distance of about 19 miles from the Red Roof Inn. At 11:37 a.m., Taneja and Kaur

6

entered the conference, where they were seen by Taneja's Amway sponsor and his wife shortly after they arrived. A short time later the sponsor texted Taneja, inviting him and Kaur to join their group for lunch. Taneja texted back that he could not make it because Kaur was not feeling well. The sponsor's wife testified that Kaur had not appeared unwell when she had seen her earlier. From the GPS device, the police determined that Taneja and Kaur attended the three day event for less than an hour, leaving the D.C. area shortly after noon. Their car continued westward, stopping in Farragut, Tennessee around midnight. Their travel resumed the following morning around 9:30 and concluded at their home about noon.

After the State rested, Taneja called nine witnesses who testified as to his character trait for peacefulness.

Taneja also called several witnesses to support his theory that another person was the shooter. Specifically, he called: (1) Ms. Komarova to suggest that the woman who ran away did so out of fear of being shot; (2) two witnesses who testified that Taneja's current annual income was $150,000 to $175,000, to suggest that he had no financial motive to commit the crime; (3) Taneja's divorce attorney, who testified that Taneja was not displeased with the outcome of the divorce; (4) a gunshot residue expert to suggest that the woman near Gabba just before her death was not the shooter; and (5) a witness who testified that an indoor shooting range near the defendant's home in Tennessee was open on Sunday, to suggest that Taneja and Kaur were on their way to the shooting range with their guns when they were arrested leaving their house.

## II.  DISCUSSION

Taneja argues that the trial court violated his right to present a defense when it excluded three witnesses, whom he had subpoenaed, were in court, and prepared to testify – Deepinder Singh, Dan Wright, and Utsav Taneja.[2]  Singh is Kaur's son; Wright was Gabba's attorney in a lawsuit against Singh; and Utsav is Taneja's son.

Taneja argues that the witnesses' testimony would have suggested that Singh shot and killed Gabba.  He relies heavily on *Kelly v. State*, 392 Md. 511 (2006), to support his argument.  The State responds that *Kelly* is distinguishable and that the trial court's ruling to exclude the witnesses was not reversible error because the proffered testimony was inadmissible hearsay and irrelevant.

### A.  Law

The Supreme Court discussed the Compulsory Process Clause of the Sixth Amendment to the United States Constitution and its applicability to the State through the Fourteenth Amendment nearly 50 years ago in *Washington v. Texas*:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.

---

[2] To avoid confusion, we shall refer to Utsav Taneja by his first name.

388 U.S. 14, 19 (1967). In Maryland, the right of a criminal defendant to produce witnesses on his own behalf is guaranteed by the Sixth and Fourteenth Amendment of the U.S. Constitution and by Article 21 of the Maryland Declaration of Rights. *Redditt v. State*, 337 Md. 621, 634-35 (1995); *McCray v. State*, 305 Md. 126, 133 (1985).

Although the right of a defendant in a criminal trial to present witnesses in his defense is a critical right, it is not absolute. *Taylor v. Illinois*, 484 U.S. 400, 407-10 (1988). *See also McCray*, 305 Md. at 133-35. "[T]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly." *Taylor*, 484 U.S. at 410. The proffered evidence must be sufficiently relevant, rather than "cast[ing] a bare suspicion upon another." *Holmes v. South Carolina*, 547 U.S. 319, 323-24 (2006) (quoting *State v. Gregory*, 16 S.E.2d 532, 534 (S.C. 1941)). In *Muhammad v. State*, we noted that:

> the right to present a defense, albeit fundamental, is nonetheless subject "to two paramount rules of evidence, embodied both in case law and in Maryland Rules 5-402 and 5-403. The first is that *evidence that is not relevant to a material issue is inadmissible*. The second is that, *even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of* unfair prejudice, *confusion of the issues, or misleading the jury*."

177 Md. App. 188, 274 (2007) (quoting *Smith v. State*, 371 Md. 496, 504 (2002)) (emphasis in *Muhammad*).

"Relevant evidence" is defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

9

probable than it would be without the evidence." Md. Rule 5-401. "Relevance is a relational concept. Accordingly, an item of evidence can be relevant only when, through proper analysis and reasoning, it is related logically to a matter at issue in the case, *i.e.*, one that is *properly provable* in the case." *Snyder v. State*, 361 Md. 580, 591 (2000) (emphasis added). Relevant evidence is admissible, and "[e]vidence that is not relevant is not admissible." Md. Rule 5-402. Even relevant evidence, however, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5-403.

A trial court is given wide latitude in controlling the admissibility of evidence. *Sifrit v. State*, 383 Md. 116, 128 (2004) (citing *Merzbacher v. State*, 346 Md. 391, 404 (1997)). We review the trial court's decision under an abuse of discretion standard. *Id*. at 128-29 (citing *Merzbacher*, 346 Md. at 404-05). "Abuse occurs when a trial judge exercises discretion in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law." *Cooley v. State*, 385 Md. 165, 175 (2005) (quoting *Jenkins v. State*, 375 Md. 284, 295-96 (2003)). "If the trial court's ruling is reasonable, even if we believe it could have gone the other way, we will not disturb the ruling on appeal." *Peterson v. State*, 196 Md. App. 563, 585 (2010) (citing *Fontaine v. State*, 134 Md. App. 275, 288 (2000)).

In accordance with the law on relevancy and admissibility, it follows that a defendant may be excluded from propounding evidence "if it merely cast[s] a bare suspicion upon another or raise[s] a conjectural inference as to the commission of the crime

10

by another." *Holmes v. South Carolina*, 547 U.S. at 323-24 (internal quotation marks omitted) (quoting *Gregory*, 16 S.E.2d at 534).  For instance, in *Worthington v. State*, 38 Md. App. 487 (1978), the defendant's counsel sought to cross-examine the victim to introduce evidence of the victim's gambling debts, under the theory that the defendant was not the only individual who had a motive to assault the victim.  *Id.* at 495-97.  The trial court sustained the State's objection because there was no other evidence submitted by the defense to support such a theory.  *Id*. at 496-97.  We affirmed the trial court's decision, acknowledging that animosity of others toward the victim *could* raise an inference that those others and not the defendant shot the victim, but "that such a connection is, *in the absence of real evidence pointing toward [defendant's] theory*, totally speculative and tenuous." *Id*. at 498 (emphasis added).  *Cf. Marshall v. State*, 174 Md. App. 572, 580-81 (2007) (while defense counsel was able to present evidence that two other suspects with possible motive and opportunity were developed by police, trial court did not err in excluding documentary evidence supporting theory because both suspects had alibis and theory was too speculative and tenuous) *and Malik v. State*, 152 Md. App. 305, 323-25 (2003) (trial court did not err in excluding evidence of prior murder and assault convictions of one of alleged victims to support theory that he and not the defendant was the gunman, as any potential relevance was outweighed by danger of unfair prejudice and misleading jury).

On that foundation, we now turn to the specific facts related to Taneja's argument which, because those facts present great nuances, we relate in some detail.

## B. Trial

After Taneja presented several character witnesses, as well as witnesses supporting his theory that someone else could have committed the crime, Taneja informed the court that he wished to call Kaur's son, Deepinder Singh, who was subpoenaed and present. Defense counsel stated that he intended to suggest that it was Singh who shot Gabba. Counsel further proffered that he wanted to question Singh about a replevin lawsuit he filed against Gabba in 2010, in which Singh alleged that Gabba lost or destroyed personal items he had stored in her home while deployed to Kuwait. The replevin court granted Gabba's motion for summary judgment in March 2011.

The court questioned whether defense counsel had a good faith basis for believing that Singh had committed the murder. Counsel, somewhat obliquely, responded that he also wished to call Dan Wright, Gabba's attorney in the replevin lawsuit, and Utsav Taneja, Taneja's son from his first marriage. Counsel then proffered that Utsav would testify to a conversation with Singh after his unsuccessful lawsuit against Gabba in which:

> Deepinder Singh told [Utsav] somebody ought to kill that B. Now, we're ask[ing], we're saying it in terms of a motion in limine. There obviously would be an objection to that, so we're asking Your Honor to rule on that substantively but it also has the purpose of answering Your Honor's question as to a good faith basis.
>
> So now, I needed to get permission to tell you that, all right. And now I've gotten it. So, that is the extent of my proffer at this point. And I think I've said, he was in the military. Was at Germantown at 2:30. He lives there. He lost the lawsuit. He filed it, hired an attorney to pursue it and he lost it. He was upset about it, and he made that statement to Utsav.

12

Defense counsel added that Singh would also testify that he had a familiarity with guns and, on the morning of the murder, he had brunch at a restaurant near the Red Roof Inn. Counsel then stated: "I don't even need to be doing what I'm doing right now . . . [because of *Kelly v. State*, 392 Md. 511 (2006)] . . . [b]ut [] we're talking about the assertion of the Fifth[.]" He continued:

> All three of these issues are intertwined. [*Kelly*], is it a good faith basis, and can he do it in front of the jury if he's going to do it. And you know this involves as we've already said the constitutional due process right to put on evidence and the Sixth Amendment.

Defense counsel then conducted a voir dire of Singh, under oath, informing Singh that he may call him as a witness and he may ask him questions about: where he was on the night before the murder, at the time of the murder, and on the afternoon after the murder; the lawsuit he filed against Gabba; a conversation he had with Utsav about how he felt about Gabba after the lawsuit; and his familiarity with handguns. Singh stated that he was willing to answer those questions, but when asked by Kaur's attorney whether he would answer questions if it implicated him in the murder of Gabba, Singh said he would not.

The discussion of Singh's invocation of his Fifth Amendment right continued. The State advised the court that Singh would not be granted immunity from prosecution, but that he would not be prosecuted because, in the State's view, "I think he might have been told about the crime afterwards, but I don't think he did anything criminal here." Defense counsel then requested that Singh be allowed to speak to a lawyer, and reiterated that he wanted to call Wright about what he observed in the lawsuit between Singh and Gabba. In

response, the court questioned Singh further, who eventually told the court that he had not "done anything."

At this point, the court ruled that Singh could not invoke his Fifth Amendment privilege because he lacked a good faith basis to believe that he would be prosecuted. The court then stated:

> So then given that, the question then becomes whether [defense counsel] now can call him as a witness to say, I filed suit against her in 2010, which was resolved in 2011. [Defense counsel] proffers that he then made this comment in I guess the late summer or fall of 2011 saying "the bitch should die." Was he present, had the ability to do it, and so what's the State's position with that, with respect to that given that he's here and able to respond to those in effect accusations?

In response, citing the rules of evidence, both the State and Kaur's attorney objected to the defense calling Singh to attempt to implicate him in the murder. They argued that Singh's testimony was inadmissible because it was irrelevant and it would confuse and mislead the jury. Defense counsel then made a second proffer that Singh, who held Taneja's power of attorney, sold Taneja's Germantown home without telling him. The court responded that this additional proffer was not relevant and asked counsel whether the right to present a defense superseded the rules of evidence; counsel said that it did. The court then ruled as follows on whether defense counsel could implicate Singh in the murder:

> [T]he whole issue appears to me is one of whether or not the evidence that you seek to elicit from this particular witness which in turn I think drives the consideration of the other witnesses, whether the evidence that you seek to present from Mr. Singh is deemed to be relevant evidence.

14

And the proffered evidence in this case, as I understand it, and I think the record clearly reflects that what you seek to do is to put before the jury Mr. Singh and establish that he had motive. That he had this grudge against Preeta Gabba which went back to 2010, 2011 as evidenced by this lawsuit. Perhaps to predate that, but as evidenced by the lawsuit of 2010 which was resolved in March of 2011.

And it's further evidenced by statements that Utsav would testify that the witness had made to him subsequent thereto in mid-2011 to late-2011 where he said, somebody should kill the bitch and at the same time there was some discussion about his background and experience, which included the fact that he was in the reserves. Has some experience with guns.

And that from this witness, that really is the limits of the evidence. I mean, the proffer seems to be that you want to create for the jury, then, the possibility that somebody else could have done this. Not your client. And so then the issue becomes whether or not the evidence proffered is relevant to prove that proposition or has a tendency to make that proposition more true or more probable.

After citing the rules on relevancy, materiality, and probative value, the court continued:

Is there anything from which the jury could logically infer from this testimony that he might possibly be the person who committed this? And there's absolutely nothing that you proffered that puts him anywhere near that gun or in touch with that gun, or conceivably explains how he possibly could have come in possession of [that] which is uncontrovertedly the murder weapon in this case.

So, the only other evidence is that he lives in the area and that he had brunch some time on the date of the shooting. But we know the shooting occurred at approximately 7:00 something in the morning, close to 8:00 in the morning.

So, I think the question is one of, it's addressed before we get an issue of the Court's discretion. I am very mindful that this is a murder case. I'm very mindful of the defendant's right to put on a defense. But I don't believe that that right

15

supersedes the require[ment that] the evidence be somehow relevant.

And when I look at all of the facts in this case, it's inconceivable to me from the facts that you've proffered that this witness would testify that any jury could reasonably infer from that particular evidence that any fact that would tend to make more probative the defense in this case, that your client was not directly involved in the shooting or that your client was only an accessory after the fact.

So for all of . . . those reasons, I therefore don't believe that the evidence is relevant evidence, and will preclude you from calling him in front of the jury. And for the same reason, preclude you from calling the other two witnesses to the extent their testimony relates to testimony that his motive to want to shoot Preeta.

Defense counsel reiterated that pursuant to *Kelly*, he wanted to call Singh, Utsav, and Wright, even though he acknowledged that the State would object. The court responded that:

in [*Kelly*] the defense called zero witnesses, which was one of Judge Cathell's problems, and in [*Kelly*] I basically anticipated the State's objection. So I asked [the defense counsel], anticipating the objection, what the evidence would be and as the dissent pointed out, everybody agreed that the evidence was inadmissible. But that [*sic*] Judge Cathell said well, the State might have changed their mind or might not have objected.

In this case, the State has told me they object. . . . and [Kaur's attorney] objects as well. . . . So I don't think [*Kelly*] applies to those facts.

Defense counsel then called Utsav, who testified, *inter alia*, about his familial relationships and Taneja's character trait for peacefulness.

16

After Utsav's testimony, defense counsel made a third proffer that, during a conversation between Utsav, Singh, and Taneja, in late 2011 or early 2012, Singh said that he was going to a shooting range and that Taneja should also buy a gun to go to a shooting range. The court ruled that because defense counsel's additional proffer was vague as to the time period and whether it resulted in Taneja purchasing the murder weapon, "it would not affect my evaluation of the issue of relevancy, and the exercising of my discretion I still would find it not to be relevant." Defense counsel asked if he could put those witnesses on the stand outside the presence of the jury, although he admitted that he had let Wright leave the courthouse. The court responded:

> Okay, well then what that means is then, we're going to have to put Mr. Wright on at some point but we don't have to put it in front of the jury because there's no agreement on what the facts are for purposes of the Court making a decision on the feel [*sic*]. So you can both call him at some point. I don't know exactly when. Maybe when the jury is deliberating we can put it on, and then you can flesh out the proffer, okay.

It is noteworthy that, although the court was agreeable to hearing Wright's testimony outside the presence of the jury, Taneja never mentioned it again, nor did any of the parties. Singh and Wright did not testify for the defense.

Taneja argues on appeal that the trial court's ruling "gutted" his defense. We are not persuaded, and explain.

Taneja proposed to question Singh about: the replevin lawsuit he brought against Gabba in 2010, a statement he made about her around that time that "someone should kill that b[itch]"; living in the area where Gabba was murdered; being familiar with weapons; selling Taneja's Germantown home after he was given power of attorney following

17

Taneja's arrest; and a statement he made to Taneja in late 2011 or early 2012 that Taneja should go to a shooting range.

We agree that such evidence would have been, at best, only tangentially relevant and had a high probability of confusing, distracting, and misleading the jury. We are mindful that evidentiary questions are left to the sound discretion of the trial court, and are not to be disturbed – even if we were inclined to rule differently – absent a clear abuse of discretion. In sum, the evidence Taneja sought to introduce through Singh was disconnected and remote. It had no other effect than to raise the barest of suspicion that Singh might have killed Gabba. *Cf. State v. Mitchell*, 4 A.3d 478, 484-88 (Me. 2010) (defendant not denied his right to present a defense where trial court excluded alternative suspect evidence); *Commonwealth v. Buckman*, 957 N.E.2d 1089, 1096-98 (Mass. 2011) (tension between neighbor and victim not sufficient to permit introduction of alternative suspect evidence). *See also* David McCord, *But Perry Mason Made it Look so Easy!: The Admissibility of Evidence Offered by a Criminal Defendant to Suggest that Someone Else is Guilty*, 63 Tenn. L. Rev. 917, 938-47 (1996).

For the same reasons, we likewise find Wright's and Utsav's proffered testimony to have been lacking in relevance and more likely to be misleading, confusing, and distracting than relevant and probative.

## C. *Kelly v. State*

Taneja relies heavily on *Kelly v. State*, 392 Md. 511 (2006), to support his "alternative suspect" argument. Kelly asked the Court of Appeals to decide:

18

> [w]hether the right to present a defense is violated when the court, without justification, and as a predicate to permitting an available witness to take the stand, requires the defense to proffer, in the State's presence, the content and theory of admissibility of the witness's testimony?

*Id.* at 517. Under the facts presented, the Court answered the question in the affirmative and reversed Kelly's convictions.[3]

In *Kelly*, the State presented evidence that three friends engaged in an angry verbal exchange with Francesco Kelly while riding a public bus in Silver Spring, after which the three friends left the bus and walked into a nearby 7-Eleven. A short time later, while they stood waiting for the next bus, a man appeared with a gun and shot at them. Two of the victims, Nicholas Watson and Melissa Wainwright, identified Kelly as the shooter. *Id.* at 517-19.

After the State rested, Kelly's attorney informed the court that she intended to call two police officers. One had been subpoenaed and was present, but the other was neither subpoenaed nor present. *Id.* at 519. The State initially objected because the defense had not included one of the witnesses on the witness list presented to the jury. In response to the court's query as to what she intended to elicit from the subpoenaed witness, defense counsel replied that she wanted to elicit testimony that the police had other information about the shooting that they failed to pursue. *Id*. at 520-21. The court indicated its opinion that the testimony would be hearsay, but granted a brief recess to enable defense counsel to locate the one witness who was in the courthouse.

---

[3] The convictions had been affirmed by this Court. *Kelly v. State*, 162 Md. App. 122 (2005).

When the trial was reconvened, defense counsel informed the court that the officer was present and ready to testify. The State requested a proffer of the officer's testimony, and the court asked counsel what the officer was going to testify to. *Id*. at 522. Initially defense counsel stated that she did not know what the officer would say, only that she wished to elicit two pieces of evidence from the officer: (1) the bus schedule, which would impeach the victims' testimony as to how long they were waiting for the bus; and (2) that the bus driver had no recollection of the altercation on the bus. *Id*. at 522-23. The court reiterated its opinion that the proffered evidence was inadmissible hearsay. *Id*. at 524. When the State questioned what defense counsel could ask of the witness that would not be inadmissible hearsay, defense counsel responded: "I don't get to ask them that in their case, and I think that I can ask it without eliciting hearsay." *Id*. at 525.

Defense counsel next stated that she also wanted to ask the officer about a bus surveillance videotape. The court, however, opined that the tape was irrelevant because it was inoperable. *Id*. at 526. When defense counsel again asked if she could elicit the bus schedule from the officer to show that the police might have interviewed the wrong bus driver, the court denied the request, stating that the officer did not have personal knowledge of the schedule. Believing that the officer would not give any admissible testimony, the court dismissed the officer and adjourned for the day. *Id*. at 526-27.

When the court asked the following day if there were any other unresolved issues, defense counsel stated she wished to call a civilian witness. The court asked for a proffer of that witness's testimony, and defense counsel objected to having "to proffer what witnesses are going to testify to. I mean, [the State] can make objections just like I have

20

to." *Id*. at 527 (emphasis omitted). Nonetheless, defense counsel said that she wanted to call the witness to testify as to Watson's habit of loitering around the bus stop and his reputation for violence in the community, to suggest that the shooter had been someone other than Kelly. *Id*. at 528. The State objected, arguing that the testimony was relevant only to a collateral issue and, further, that the proposed witness did not have personal knowledge. The Court of Appeals resolved that the State objected only because the trial court required defense counsel to make its proffer. *Id.* at 528.

The discussion of the matter continued, defense counsel stating that the testimony was relevant and the court concluding it was too speculative for a jury to infer that others might have wanted to kill Watson, and would have come to the 7-Eleven to shoot him at that precise time. *Id*. at 528-30. The court ultimately ruled that it would not permit defense counsel to call the civilian witness. When the court then asked if the defense rested, defense counsel stated, "I guess so, since I am not allowed to call any witnesses." *Id*. at 530 (emphasis omitted).

The Court of Appeals began its analysis of Kelly's assertions by announcing that it would review the trial court's "decision not to allow the witnesses to testify under the abuse of discretion standard applicable to exclusion of evidence in general." *Id*. at 532. The Court discussed the law on compulsory process, recognizing that while it is a fundamental right, it does not confer the right to present inadmissible evidence. *Id*. at 532-37.

The Court then reasoned that the trial court's refusal to place the witnesses on the stand was premature, stating:

21

> [T]he petitioner made the required showing to, at the very least, permit him to question the witnesses. Petitioner's counsel proffered that Officer Patel would testify to the conduct of the investigation questioning the events related by the three victims. [The civilian witness] was to impeach Watson's testimony, which would go to his credibility as a witness. This testimony presumably could have been favorable to the petitioner. Watson was one of two witnesses who could identify the petitioner as the shooter.

*Id*. at 538.

The Court noted that the State did not object to two of the three witnesses, and believed that the State objected only to the civilian witness testifying when prompted by the court's calling for the proffer. *Id*. at 528. The Court stated that "the trial judge should have allowed the witnesses to testify and rule on the admissibility of their testimony, if proper objections were made, during questioning by the defense, not before." *Id.* at 539. The main concern was that, rather than allowing the State to make or waive its pertinent objections in the normal course of examination, "the court *sua sponte* opted to require the petitioner's counsel to proffer the questions she was going to ask. It then decided that, because such questions would only elicit hearsay testimony, the witnesses would not be allowed to testify." *Id.* at 540. In doing so, in the Court's view, the trial court impermissibly became an advocate for the State:

> When the trial court makes a ruling as to the admissibility of evidence on its own without a prior objection by any of the parties, the court leaves its role as an arbiter and assumes another role as a party to the proceeding, placing into question the defendant's right to a fair trial.

*Id.* at 541. This danger is especially magnified where there is a lopsided requirement of a pre-examination proffer as to all of the defendant's witnesses but not to any of the State's witnesses. *Id.*

The Court concluded:

> When the court assumes the role of a party by ruling on the admissibility of evidence in the absence of appropriate objections, the court departs from the adversarial nature of our system where the State, not the court, bears the burden of objecting to the testimony offered by the opposing party. Should the State fail to object, otherwise inadmissible evidence sometimes may be admitted to the detriment of its case because . . . such a failure to object is considered a waiver. This is not to say that the defendant will be allowed to present properly objected to testimony that violates the rules of evidence or procedure. It merely requires that exclusion take place at the appropriate time and in the appropriate manner. The responsibility of the trial court to control the proceedings before it does not extend to the right to take over a party's case. When that occurs, as it occurred here, the court risks denying to a defendant the fair trial guaranteed to him by both the United States Constitution and Maryland's Constitution.

> We agree with the Court of Special Appeals that "[t]he conduct of the trial must of necessity rest largely in the control and discretion of the presiding judge." *Kelly*, 162 Md. App. at 141. That control, however, must safeguard the defendant's constitutional rights.

*Id*. at 542-43 (internal string citations and parentheticals omitted). Because the court denied Kelly the right to present a defense by not allowing any of his witnesses to testify, he was granted a new trial. *Id.* at 543.

While *Kelly* is similar to the case before us, we are ultimately persuaded that it is distinguishable. In *Kelly*, the trial court required defense counsel to proffer the testimony of its only witnesses. Here, Taneja's proffer of the testimony of Singh and the other two

23

witnesses was generated by a Fifth Amendment concern as to Singh. But for that concern, no proffer would have been called for. This is not, as the Court found in *Kelly*, a situation where the trial court abandoned its role as a neutral arbiter and required counsel to proffer its defense. Rather, the court focused its analysis on the relevance of the witnesses' proffered testimony, and not its admissibility under other rules of evidence. Throughout the discussion of Singh's potential testimony, the court noted variously:

> [T]he whole issue appears to me is one of whether or not the evidence that you seek to elicit . . . from Mr. Singh is deemed to be relevant evidence.
>
> * * *
>
> And so then the issue becomes whether or not the evidence proffered is relevant to prove that proposition or has a tendency to make that proposition more true or more probable.
>
> * * *
>
> Is there anything from which the jury could logically infer from this testimony that he might possibly be the person who committed this?
>
> * * *
>
> I'm very mindful of the defendant's right to put on a defense. But I don't believe that that right supersedes the require[ment that] the evidence be somehow relevant.
>
> * * *
>
> So for all of . . . those reasons, I therefore don't believe that the evidence is relevant evidence, and will preclude you from calling him in front of the jury.

Moreover, as was Kelly, Taneja was not denied the only witnesses available to him; Taneja was able to present a defense by vigorous cross-examination of the State's witnesses and by calling several defense witnesses. Further, again unlike *Kelly*, the State and Taneja's co-defendant, Kaur, objected to the calling of the three witnesses. It is noteworthy that Kaur strenuously objected – understandably, given that it was her son whom Taneja wanted to implicate in the murder of Gabba. We cannot conclude that both the State and Kaur's attorney would have failed to make a timely objection had the witnesses been called to the stand.

We also find *Void v. State*, 325 Md. 386 (1992), to be instructive, but nonetheless distinguishable. Void was charged with several crimes related to the kidnaping and robbery of Officer Steedley, the victim and the State's essential witness. The State's case rested substantially on Steedley's credibility. *Id.* at 387.

Prior to Void's trial, Steedley had been charged and tried on, but acquitted of, perjury charges related to the prosecution of unrelated drug offenses. Void subpoenaed three Prince George's County Police Department officers who had testified against Steedley at the perjury trial, wishing to call them to testify as to Steedley's character for truth and veracity. *Id.* at 388. Special counsel for the police department filed a pre-trial motion to quash the subpoenas, arguing that: the officers had no knowledge of the arrest of Void; that the defense would attempt to elicit the prior perjury charge; and requiring the officers to be in court would place a great burden upon the department. The trial court agreed and quashed the subpoenas. *Id.* at 388-89.

25

On appeal, we affirmed the trial court's ruling, holding that the officers' testimony would not have been admissible. The Court of Appeals reversed, reasoning:

> We believe that a fair conclusion can be drawn from the proceedings at the hearing on the motion that the testimony Void sought was directed to the character of Steedley. We are not in accord with the State's notion that Void was merely attempting to introduce evidence of prior bad acts by Steedley under the guise of character evidence. It may be that defense counsel's argument could have been articulated in more specific terms. And perhaps some of the reasons he gave for desiring the witnesses' testimony, and which the judge declared he would not permit, may not have been admissible. But that did not justify precluding Void's examination of the witnesses. The proper time for the judge to determine the admissibility of their testimony was upon their examination.

*Id.* at 392. The Court continued:

> Here, however, the trial judge did not have a sufficient basis for the exercise of sound discretion. He refused to hear from the subpoenaed witnesses. Their affidavits were of no help; the averment that the witnesses had no knowledge of the facts and circumstances of the investigation, arrest or prosecution of Void was of no consequence. Their lack of such knowledge was neither relevant nor material to a determination of the credibility of Steedley. The bare statement that any personal knowledge of the subpoenaed witnesses that might be used to discredit any witness came to the subpoenaed witnesses in a confidential investigation, did not suffice to justify a refusal to permit Void to examine his witnesses. The judge could winnow out on hearing their testimony what was inadmissible as legitimately protected. We do not perceive how he could properly determine, on what was before him, that none of their testimony relating to the credibility of Steedley was admissible without affording Void an opportunity to examine them under oath.

*Id.* at 393-94. Reversing, the Court stated:

> The short of it is that the trial judge should have heard from the subpoenaed witnesses, either at a pretrial hearing or

at the trial out of the presence of the jury. He could, at that time, determine whether the witnesses had admissible testimony to offer. He erred in short-circuiting the common law and statutory rights of Void by quashing the subpoenas.

*Id*. at 394 (internal citation omitted).

The present case is likewise distinguishable from *Void*. The court in *Void* had little information before it when it ruled. Here, the exchange between the parties and the court about the facts and the law relating to the proposed testimony was expansive, in contrast with the essentially *sua sponte* rulings in both *Kelly* and *Void*. In fact, that discussion consumed more than 50 pages of trial transcript. Indeed, the Court in *Kelly* observed that the trial court's rulings were "premature." *Kelly*, 392 Md. at 538, 539. In contrast, here the court granted considerable breadth to the discussion; defense counsel was permitted to proffer in detail what he wanted to ask Singh should he be called and how Singh would respond. Taking the witnesses' testimony outside of the presence of the jury would have been appropriate, indeed perhaps preferable, but in light of the circumstances presented and our standard of review, we find no abuse of discretion.[4]

### III. CONCLUSION

In sum, we can find no reason to conclude that the court's rulings were arbitrary, capricious, or beyond the letter of reason of the law. Thus, we are persuaded that the trial

---

[4] We note that the court specifically stated that it was amenable to taking Wright's testimony out of the presence of the jury later during the trial. By not again raising the question, Taneja has waived it as to Wright. *Cf. Gilliam v. State*, 331 Md. 651, 691 (1993) ("As Gilliam did not object to the course of action proposed by the prosecution and taken by the court, and apparently indicated his agreement with it, he cannot now be heard to complain that the court's action was wrong.")

27

court did not abuse its discretion in not permitting Taneja to call Singh, Wright, and Utsav to testify as to an "alternative suspect" possibility.  We affirm the judgments of the trial court.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**
**COSTS ASSESSED TO APPELLANT.**